## UNITED STATES DISTRICT COURT, DISTRICT OF NEBRASKA

|  |  |
|---|---|
| GREEN PLAINS TRADE GROUP LLC, GREEN PLAINS INC., GREEN PLAINS WOOD RIVER LLC, GREEN PLAINS ORD LLC, GREEN PLAINS ATKINSON LLC, GREEN PLAINS CENTRAL CITY LLC, GREEN PLAINS YORK LLC, GREEN PLAINS SHENANDOAH LLC, GREEN PLAINS OTTER TAIL LLC, GREEN PLAINS FAIRMONT LLC, GREEN PLAINS HEREFORD LLC, GREEN PLAINS MOUNT VERNON LLC, GREEN PLAINS MADISON LLC, GREEN PLAINS HOPEWELL LLC, GREEN PLAINS SUPERIOR LLC, GREEN PLAINS OBION LLC, GREEN PLAINS BLUFFTON LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARCHER DANIELS MIDLAND COMPANY,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Adam J. Levitt
John E. Tangren
Mark S. Hamill
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
mhamill@dicellolevitt.com

Greg G. Gutzler
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York 11022
Tel.: (646) 933-1000
ggutzler@dicellolevitt.com

David A. Domina (#11043NE)
**DOMINA LAW GROUP PC LLO**
2425 South 144th Street
Omaha, Nebraska 68144
Tel.: (402) 493-4100
ddomina@dominalaw.com

**Dated:** July 14, 2020

## SUMMARY OF THE CASE

1.     Archer Daniel Midlands Company ("ADM") is a major producer and seller of ethanol in the Midwest and throughout the United States. Most relevant to this lawsuit, ADM produces ethanol at multiple bioprocessing sites in the United States and sells ethanol into cash markets, including a cash spot market at the Kinder Morgan Argo Terminal in Argo, Illinois (the "Argo Terminal"). While being one of many cash spot markets, the Argo terminal is unique because it serves as the price reference point for nearly all physical and financial ethanol transactions across the world. As a producer and seller of ethanol, ADM should want pricing mechanisms that reflect actual market prices at the Argo Terminal and any other locations they sell ethanol.

2.     During the relevant time period from November 2017 to present (the "relevant time period"), ADM routinely acquired financial derivative contracts that went up in value if the price for ethanol at the Argo Terminal went down.

3.     As a physical producer of ethanol, ADM should want stable or rising prices so that its physical sales would earn a profit. However, because of the disproportionate size of its derivative financial position, ADM manipulated prices to fall so that its financial derivatives would earn a profit. Instead, ADM sacrificed its profits on physical sales in order to leverage even larger profits on its derivatives contracts.

4.     To succeed, ADM needed to execute a three-step strategy. First, ADM needed to ensure that physical prices at the Argo Terminal would decline (*i.e.*, to depress prices), which ADM did by: (i) flooding the Argo Terminal with ethanol, and (ii) hurriedly lowering offers or accepting low priced bids as the dominant seller in the MOC pricing window (the window that controls much of the pricing for the physical ethanol market, to be described in greater detail below), rather than asking or waiting for a higher price. Secondly, by selling on average one

million gallons of ethanol daily in the MOC window, ADM was able to adversely impact the pricing of over 32 million gallons of physical ethanol produced industry-wide per day. Finally, ADM needed to gain enough leverage to turn its own physical ethanol losses at the Argo Terminal (and associated losses on its plant production), into financial wins at NYMEX and CBOT, which it did by acquiring short-sided speculative derivative contracts at an unprecedented scale and then targeting the terminal and pricing mechanism used to determine the price of those derivative contracts. ADM's foregoing manipulation of the derivative contracts market is illegal; it is forbidden by the Commodities Exchange Act ("CEA").

5.      In executing its strategy beginning in November 2017, ADM was a buyer in the MOC window only once for 210,000 gallons, but was a seller at all other times for a total of approximately 821 million gallons – a sea change from their pre-November 2017 trading behavior in which ADM was consistently a buyer. While selling in the MOC window, ADM was simultaneously purchasing physical gallons with the Argo terminal at prices above which it was selling in the window, which is completely uneconomic behavior for an ethanol producer that would be seeking to maximize the sell price of its physical sales.

6.      ADM used its size, proximity, and relationships to exploit and overwhelm the Argo terminal and force a desired, self-serving pricing outcome upon other financial and physical market participants. The uneconomic nature of ADM's trading behavior left other participants in the dark about ADM's strategy, and even those participants who understood it could not take on the enormous risk required to defend themselves through their own derivatives positions.

7.      ADM put ill-gotten money into its own pockets by its strategy of making uneconomic decisions that were not correlated to the actual price of ethanol in order to support its speculative financial positions. But ADM also knew that it would take hard-earned money out of

3

the pockets of other ethanol producers by depressing prices at the Argo Terminal, hurting the producers and imposing downstream pain on corn farmers and cooperatives.

8.      While the Argo Terminal is a critical point for ethanol price discovery, most physical ethanol sales and deliveries in the United States are made outside of the Argo Terminal, including sales contracts that are priced based on the Argo Terminal MOC window pricing mechanism. However, these physical ethanol sales are overwhelmingly tied to sales contracts that are priced based on the Argo Terminal pricing. Thus, as ADM knew when it developed and executed the illegal and unconscionable strategy (which it continues to do), ADM's downward manipulation of prices at the Argo Terminal inevitably reduced the prices that ethanol producers received for sales under those contracts. ADM's foregoing targeting of producers in the performance of their ethanol sales contracts is unlawful tortious interference with contractual relations.

9.      Thus, ADM harmed producers and traders through its manipulation of ethanol prices, depriving them of the benefits of a fair market, and also harmed producers through its tortious interference of lowering the Argo Terminal-based price index which it knew producers use as the pricing mechanism for their sales contracts, depriving producers of the benefits of contracting/pricing free from tortious interference.

## PARTIES

10.      In this complaint, Plaintiffs are collectively referred to as "Green Plains." Green Plains is one of the largest sellers of ethanol, with annual production and sales of over one billion gallons of ethanol.

11.      Green Plains Inc. ("GPRE") is an Iowa corporation with its principal place of business in Omaha, Nebraska that owns fifteen single-member bioprocessing LLCs. GPRE also

owned the single-member bioprocessing LLC Green Plains Holdings II LLC for certain parts of the relevant time period; it has since dissolved and distributed the proceeds to GPRE.

12.     Green Plains Trade Group LLC ("Green Plains Trade") is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Pursuant to marketing agreements with the Green Plains single-member bioprocessing LLCs, Green Plains Trade markets and sells ethanol to outside third parties on behalf of Green Plains' single-member bioprocessing LLCs.

13.     Green Plains Wood River LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Wood River LLC operates a bioprocessing plant in Wood River, Nebraska that produces ethanol for sale via its marketing agreement with Green Plains Trade.

14.     Green Plains Ord LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Ord LLC operates a bioprocessing plant in Ord, Nebraska that produces ethanol for sale via its marketing agreement with Green Plains Trade.

15.     Green Plains Atkinson LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Atkinson LLC operates a bioprocessing plant in Atkinson, Nebraska that produces ethanol for sale via its marketing agreement with Green Plains Trade.

16.     Green Plains Central City LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Central City LLC operates a bioprocessing plant in Central City, Nebraska that produces ethanol for sale via its marketing agreement with Green Plains Trade.

17.     Green Plains York LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains York LLC operates a bioprocessing plant in York, Nebraska that produces ethanol for sale via its marketing agreement with Green Plains Trade.

18.     Green Plains Shenandoah LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Shenandoah LLC operates a bioprocessing plant in Shenandoah, Iowa that produces ethanol for sale via its marketing agreement with Green Plains Trade.

19.     Green Plains Otter Tail LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Otter Tail LLC operates a bioprocessing plant in Fergus Falls, Minnesota that produces ethanol for sale via its marketing agreement with Green Plains Trade.

20.     Green Plains Fairmont LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Fairmont LLC operates a bioprocessing plant in Fairmont, Minnesota that produces ethanol for sale via its marketing agreement with Green Plains Trade.

21.     Green Plains Hereford LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Hereford LLC operates a bioprocessing plant in Hereford, Texas that produces ethanol for sale via its marketing agreement with Green Plains Trade.

22.     Green Plains Mount Vernon LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Mount

Vernon LLC operates a bioprocessing plant in Mount Vernon, Indiana that produces ethanol for sale via its marketing agreement with Green Plains Trade.

23.    Green Plains Madison LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Madison LLC operates a bioprocessing plant in Madison, Illinois that produces ethanol for sale via its marketing agreement with Green Plains Trade.

24.    Green Plains Hopewell LLC is a Delaware limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Hopewell LLC operated a bioprocessing plant in Hopewell, Virginia that produced ethanol for sale via its marketing agreement with Green Plains Trade.

25.    Green Plains Superior LLC is an Iowa limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Superior LLC operates a bioprocessing plant in Superior, Iowa that produces ethanol for sale via its marketing agreement with Green Plains Trade.

26.    Green Plains Obion LLC is a Tennessee limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Obion LLC operates a bioprocessing plant in Obion, Tennessee that produces ethanol for sale via its marketing agreement with Green Plains Trade.

27.    Green Plains Bluffton LLC is an Indiana limited liability company and subsidiary of GPRE, with its principal place of business in Omaha, Nebraska. Green Plains Bluffton LLC operated a bioprocessing plant in Bluffton, Indiana that produced ethanol for sale via its marketing agreement with Green Plains Trade through November 15, 2018.

28.     ADM is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its global headquarters at 77 West Wacker Drive, Chicago, Illinois 60601.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, and under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the federal courts over any class action where any member of the plaintiff class is a citizen of a state different from any defendant, and where the matter in controversy exceeds $5,000,000, exclusive of interest and costs. The total claims of class members here exceed $5,000,000 in the aggregate, exclusive of interest and costs.

30.     This Court has personal jurisdiction over ADM because, during the Relevant Period, ADM transacted business in the State of Nebraska and had substantial contacts with the State of Nebraska. In addition, ADM directed its conduct at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the State of Nebraska.

31.     Venue is proper in this District under 28 U.S.C. § 1391(b).  ADM transacts business and has agents in this District; a substantial part of the events giving rise to Green Plains' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

32.     The activities of ADM were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States, including in the markets for financial derivatives based on ethanol and the market for ethanol itself.

## FACTUAL BACKGROUND

### A.      The U.S. Ethanol Market

33.     Ethanol is a renewable fuel made primarily from corn and other grains.

34.     The current domestic ethanol market was initially created by federal law and state regulations that set renewable fuel requirements for transportation fuel. In particular, the Energy Independence and Security Act of 2007 set Renewable Fuel Standards that increased the volume of renewable fuel blended into gasoline. While federal law sets targets for renewable fuels, ethanol is a competitive alternative to gasoline and gasoline components all over the world.

35.     Renewable Fuel Standards require gasoline producers to buy a certain quantity of renewable fuels (such as ethanol) each year to blend into gasoline used as transportation fuel. Ethanol is the renewable fuel most used by obligated parties to meet this renewable fuel requirement. Legal and regulatory requirements, along with alternative economics of high-quality blending components, play a large role in the demand for ethanol by creating a class of "ethanol consumers" consisting mostly of refineries, importers, blenders, and general gasoline resellers.

36.     Buyers in the ethanol market can get their ethanol primarily in two ways. First, they can buy ethanol directly from an ethanol producer, contracting to have the producer ship ethanol straight to the buyer's facilities for blending with gasoline that is then shipped to retail markets. Second, they can choose to buy ethanol at terminals located throughout the country, where ethanol producers ship and store large quantities of ethanol via railcar, tanker truck, or barge. Ethanol stored at terminals is available for immediate, or "spot," sale to buyers. At these terminals, ethanol and gasoline can be blended onsite for ease of shipment to retail end users; alternatively, buyers can transport the ethanol purchased at terminals back to their own facilities or refineries for blending.

37.     Terminals also serve as locations where other buyers who do not blend ethanol for end use can acquire and ship it for resale elsewhere; prices can be lower as well. By doing so, such

middlemen and resellers have an opportunity for market arbitrage. Terminals and markets referenced in this complaint include New York Harbor, Gulf Coast and West Coast.

38.    In addition to the locations mentioned above, another market that is referenced in this complaint is Chicago Rule 11. "Rule 11" is a railroad term for switching lines at a set destination. When a railcar is traded at Chicago Rule 11, it is handed off from one Class I railroad to another, where the shipper pays freight from the plant to the Chicago interchange, and the buyer pays it from the Chicago interchange beyond (to the destination). The Rule 11 seller will learn the ultimate end-route destination when the buyer provides nominations, which occurs prior to creating a bill of lading and releasing the loaded cars at origin to the railroad. Upon delivery of the Rule 11 contract, the seller will be notified when the cars are constructively placed at destination, then released empty to the railroad. The time that the car returns to the plant is estimated based on its past velocity. Actual title transfers at Chicago, when the rail line interchange occurs.

39.    The Rule 11 price is determined by an analysis of local plant values and destination basis, plus freight from the plant to the Chicago Rule 11 interchange. Car cost and uncertainty of delivery/end destination are not taken into account in pricing. In a normal market, to account for the throughput, Rule 11 trades flat to a slight discount to ethanol trading out of the Kinder Morgan Argo terminal.

40.    Below is a diagram showing the general flow of ethanol production and distribution in the U.S.



Source: Alternative Fuels Data Ctr., U.S. Dep't of Energy, *Ethanol Production & Distribution*, https://afdc.energy.gov/fuels/ethanol_production.html (last visited September 4, 2019).

41.     The Midwest is the epicenter of U.S. ethanol production, dwarfing every other region. The U.S. Energy Information Administration reports that 176 of the 200 ethanol plants in the U.S. (88%) are located in the Midwest, in a region defined as Petroleum Administration for Defense District 2, or PADD 2.



Source: U.S. Energy Information Administration.

42.    Ethanol mills are concentrated in the Midwest and thus have higher capacities of ethanol production in the Midwest than elsewhere in the U.S. As shown in the diagram below, of the country's nearly 16.3-billion-gallon annual production capacity, the Midwest region accounts for more than 14.8 billion gallons (91%) of total production. Shipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business.



43.     ADM is one of the country's largest producers of ethanol, operating eight mills (a mix of dry and wet mills located in Nebraska, Iowa, Minnesota, and Illinois) capable of producing a total of 1.69 billion gallons of ethanol, or approximately 10% of the U.S. annual ethanol production of 16 billion gallons.

## B.     The Argo Terminal and the Chicago Benchmark Price

44.     The Kinder Morgan Argo Terminal in Argo, Illinois is a critical locus in the Midwest price discovery in the broader U.S. ethanol market and is utilized at varying degrees for transporting ethanol to meet demand. Accordingly, the Argo Terminal price for ethanol influences the prices of ethanol sold at other terminals, as well as the prices that private parties negotiate in non-terminal ethanol sales. Critically, to everyone from producers to consumers, the Argo Terminal serves as the key indicator for the underlying value of ethanol as a commodity.

45.     The Argo Terminal is one of the largest storage facilities of the approximately 1,200 ethanol terminals in the country and the largest in the critical PADD 2 region. It can handle shipments by rail, truck, and barge. Because of this multimodal capability, the Argo Terminal serves all segments of ethanol purchasers, from blenders and other end users to resellers and middlemen. However, its capacity can be overwhelmed by a determined producer, which is how ADM exploited the terminal to create the false appearance of oversupply of ethanol.

46.     In recognition of the key role the Argo Terminal plays in the U.S. ethanol market, pricing services such as S&P Global Platts ("Platts") and the Oil Price Information Service ("OPIS") provide benchmark price assessments that reflect the trading price of ethanol at the Argo Terminal on a daily basis. Buyers and sellers of ethanol (whether at other terminals or in private negotiated transactions) use these Argo Terminal price assessments to determine what the fair market value of ethanol is at a given time nationwide. Market participants also use Platts and OPIS data to study market trends and predict future movement in ethanol prices for purposes of strategic planning, including hedging and speculation on ethanol derivatives.

47.     One of the impactful price assessments compiled by Platts at the Argo Terminal is the benchmark Chicago Ethanol (Terminal) price—what this complaint will refer to as the "Chicago Benchmark Price." The Chicago Benchmark Price is calculated every trading day during the Market-on-Close ("MOC") window from 1:00 p.m. to 1:30 p.m. C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. While the Platts assessment is critical to many market participants, it is important to note that all assessments in Chicago become co-dependent on establishing value, as they are tightly correlated and represent the same location and similar timing.

48.     Before each day's MOC window, ethanol buyers post bid prices and ethanol sellers post offer prices. Under normal trading practices, buyers and sellers adjust their bids and offers in response to the prices proposed by their potential counterparties—motivated sellers will decrease their offers to beat the offers of competing sellers, while motivated buyers will increase their bids to beat those of competing buyers. Once there is a match between a buyer bid and a seller offer during the MOC, a sale is consummated.

49.     When an ethanol seller agrees to sell ethanol at the posted bid price of a buyer, this practice is known as "hitting the bid." The buyer equivalent to hitting the bid is referred to as "lifting the offer," and occurs when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller.

50.     This back-and-forth negotiation between ethanol buyers and sellers is crucial for price discovery in the ethanol market and the calculation of the Chicago Benchmark Price. Without it, the Platts price assessment would lack a strong, market-based foundation.

**C.      Physical Ethanol Sales Are Tied to the Chicago Benchmark Price**

51.     As noted above, the Chicago Benchmark Price is a critical part of price discovery for the broad market for physical sales of ethanol in the United States and overseas.

52.     Green Plains, as well as many other ethanol producers, routinely enters into contracts for the physical sale of ethanol in which the per-gallon price is set by reference to the Chicago Benchmark Price plus or minus a small additional amount determined by location basis.

53.     Buyers and sellers of ethanol rely on the Chicago Benchmark Price as a benchmark for physical sales because they seek to transact at a price that reflects ethanol's current and fair market value. Ethanol market participants assume that the Chicago Benchmark Price is a fair and accurate indication of ethanol's current market value.

54.     ADM's manipulation of the Chicago Benchmark Price and its uneconomic, even predatory, targeting of the Argo Terminal with unwanted supply, upset these market expectations and caused physical ethanol sales tied to the Chicago Benchmark Price to close at a price that did not reflect ethanol's fair market value.

**D.      Ethanol Derivatives Are Also Tied to the Chicago Benchmark Price**

55.     Notably, the Chicago Benchmark Price is also used to establish the value of and to settle several important ethanol derivatives: (1) the Chicago Ethanol (Platts) Futures contract

(CME symbol: CU) traded on NYMEX ("CU"); (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT. The complaint refers to these futures and options contracts collectively as the "Chicago Ethanol Derivatives."

56.     A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity (including the place of delivery if physically settled) and are standardized to be identical for all participants to facilitate trading on futures exchanges such as the CME. Given the standardization of the contract specifications, the only contract variable is price, which market participants discover by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

57.     A futures contract can be settled in one of two ways. A physically settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. By contrast, a cash settled futures contract results in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity.

58.     An option contract is a type of financial derivative that gives the buyer the right—but not the obligation as with a futures contract—to either buy or to sell a particular commodity at

a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date"). A "put" or "put option" is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of a particular commodity at the strike price, by or on the expiration date. A "call" or "call option" is a financial contract that gives the owner the right, but not the obligation, to buy an agreed quantity of a particular commodity at the strike price, by or on the expiration date.

59.     The value of an option contract also fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. That value, as well as the decision to exercise the option, depends on whether it is "in-the-money" or "out-of-the-money." An in-the-money call option is one where the strike price is below the current price of the underlying asset. An out-of-the-money call option is one where the strike price is above the current price of the underlying asset. Whether an option is in or out-of-the-money depends on the relevant reference price at the time of option settlement—the at-the-money price.

60.     The Chicago Ethanol (Platts) Futures Contract (CME symbol: CU) is the most liquid, or most highly traded, financial derivative tied to the Chicago Benchmark Price. The Chicago Ethanol (Platts) Futures Contract has had an average monthly trading volume on the CME in excess of 99,000 contracts between November 2017 and today.

61.     Each Chicago Ethanol (Platts) Futures contract is traded on NYMEX, represents 42,000 gallons (or 1,000 barrels) of ethanol, and is valued as the size (42,000 gallons) multiplied by the floating price quoted in increments of $0.0001, or one-hundredth of a cent, per gallon.

62.     Thus, one Chicago Ethanol (Platts) Futures contract with a Chicago Benchmark Price of $1.50 per gallon would be worth $63,000 (42,000 gallons times $1.50 per gallon); if that price were to increase to $2.00 per gallon, the futures contract would be worth $84,000. In other

words, any one cent change in the Chicago Benchmark Price results in a $420 change to the value of each Chicago Ethanol (Platts) Futures contract.

63.     The Chicago Ethanol (Platts) Futures contract is cash settled, meaning that the contract parties pay each other based on the difference between the contract price and the settlement price, and there is thus no requirement for physical delivery to satisfy the contract.

64.     From November 1, 2017 through August 31, 2019, total volume in the Chicago Ethanol (Platts) Futures contract as reported by CME was 2,180,005 contracts.

65.     The CME also offers Chicago Ethanol (Platts) Average Price Options contracts (CME symbol: CVR), which are financially settled, non-early exercisable options of the underlying Chicago Ethanol (Platts) Futures contract, that are traded on NYMEX. Accordingly, the value of Chicago Ethanol (Platts) Average Price Options is also directly related to the Chicago Benchmark Price calculated by Platts at the Argo Terminal.

66.     As the CME notes, for the Chicago Ethanol (Platts) Average Price Options, a "call option represents the differential between the final settlement price of the underlying futures less the strike price, or zero, whichever is greater, multiplied by 42,000 gallons. A put option represents the differential between the strike price [less] the final settlement price of the underlying futures, or zero, whichever is greater, multiplied by 42,000 gallons."

67.     From November 1, 2017 through August 31, 2019, CME reports that total volume in Chicago Ethanol (Platts) Average Price Options was 182,506 contracts.

68.     The CME also offers the CME's Ethanol Futures Contract (CME symbol: EH). The EH contract is a physically settled ethanol futures contract listed on CBOT, with each contract representing 29,000 gallons of ethanol to be delivered in the contract month at the price of the contract.

69.     While not settled directly to the Chicago Benchmark Price, the market price that EH contracts trade at is heavily influenced by and highly correlated to the Chicago Benchmark Price because traders incorporate changes in the Chicago Benchmark price into their bid and offer prices on the contract, reflecting the Argo Terminal's key role as the largest terminal in the Midwest in price discovery across the United States ethanol market.

70.     Thus, ADM's downward manipulation of the Chicago Benchmark Price would cause EH contracts to trade at artificial prices. This, in turn, would cause actual damages to traders who traded in the EH contract and/or used the EH contract as a pricing mechanism.

71.     From November 1, 2017 through August 31, 2019, CME reports that total volume in the EH contract was 328,024 contracts.

**E.     The Chicago Benchmark Price and Chicago Ethanol Derivatives Are Highly Susceptible to Manipulation**

72.     In developing the manipulation scheme, ADM recognized four key features of the Chicago Benchmark Price and of Chicago Ethanol Derivatives that made them highly susceptible to manipulation by ADM.

73.     First, both the Chicago Benchmark Price and Chicago Ethanol Derivatives were tied inextricably to trading activity at only one location: the Argo Terminal in Argo, Illinois. The inbound and outbound supply capabilities of the Argo Terminal can be affected by strategically timed ethanol deliveries by a market participant delivering a majority of the inbound volume to the terminal during key pricing periods in significant sizes, as compared to the total volume traded during the closing window each day.

74.     ADM had five ethanol production facilities within 250 miles of the Argo Terminal. Combined, these facilities had 1.237 billion gallons of total annual ethanol production capacity. Most of these facilities were able to ship ethanol into the Argo Terminal via railcar, barge, and

tanker truck. This meant that ADM, compared to its ethanol producer competitors, had a greater ability to flood the Argo Terminal with ethanol and sell it at lower prices. As ADM's trading has illustrated, a large market participant can focus its efforts on the Argo Terminal and overload it with supply and trading activity during the settlement window. Since the Chicago ethanol contract is not physically settled, there is no meaningful convergence event to correct prices, which contributes to the success of a long-term manipulation strategy.

75.     For example, ADM's apparent delivery of multiple barges of ethanol to the Argo Terminal at or near the same time in 2018 has demonstrated that inbound and outbound supply at the Argo Terminal can be choked off or at least significantly impacted by strategic deliveries of product by barge. When this happens, the Argo Terminal no longer functions as a liquid and efficient clearing point; instead, it can be exploited in order to influence prices in both the spot and futures markets.

76.     Several examples of techniques ADM used to exploit the Argo Terminal through unnatural or uneconomic actions follow below.

- On November 28, 2018, ADM nominated eight barges of ethanol from New Orleans to Argo. Argo barge freight rates from the Gulf are approximately $.08/gallon, At the time, the New Orleans market was paying $1.35 for ethanol, which means that the New Orleans buyer was willing to pay ADM the equivalent of $1.27 ($1.35 less $.08). In contrast, buyers at Argo were willing to pay about $1.17 at that time. Although the economic trade would be to barge gallons south to New Orleans for a 10 cent premium market, ADM instead took gallons from a premium New Orleans market to sell them at a discount at Argo.

20

- Argo received an inbound train from ADM in the week following June 6, 2019. At that time, Rule 11 was trading at a $.03 premium to Argo, and with throughput, ADM was sending gallons into Argo at a $.05 detriment.

- On June 19, 2019, ADM was sending barges back into Argo at a $0.04 detriment to Rule 11.

77.    Second, the Chicago Benchmark Price is calculated based on bids, offers, and trades occurring during a mere half-hour of daily trading at the Argo Terminal. Because of the MOC window's limited duration and trading volume, ADM could significantly influence the Chicago Benchmark Price downward by concentrating its aggressive pricing and selling into just 30 minutes of a trading day. Moreover, ADM could exert this downward influence on the Chicago Benchmark Price while limiting its losses to a comparatively small volume of physical ethanol trades during the MOC window. Settlements can be influenced by physical volume on one side of the market during the 30-minute closing window each day, and there is no meaningful convergence event to correct aberrant pricing. ADM chose to ignore or limit activity in more discrete avenues to sell ethanol in the Argo Terminal, avenues that were commonly used by ADM overtime.

78.    Third, the prices and settlement values of Chicago Ethanol Derivatives and most physical ethanol contracts, are tied to the Chicago Benchmark Price. Settlement of the Chicago Ethanol (Platts) Future contract (the most actively traded ethanol derivative) is "based on the arithmetic average of the high and low quotations from Platts for [the Chicago Benchmark Price] for each business day that it is determined during the contract month," and the value of Chicago Ethanol (Platts) Average Price Options is in turn tied directly to the settlement price of Chicago Ethanol (Platts) Future contracts. Trading prices for the physically settled EH contract are likewise heavily influenced by and highly correlated to the key Chicago Benchmark Price. This meant that

ADM's actions during the MOC window at the Argo Terminal could directly influence the prices and settlement values of physical ethanol contracts and Chicago Ethanol Derivatives.

79.    Fourth, unique features of Chicago Ethanol Derivatives allowed ADM to take outsized short positions, while also being able to have an outsized downward influence on the Chicago Benchmark Price with a relatively small number of aggressively priced daily trades of physical ethanol—thus enabling ADM to effectively manage and offset the losses associated with those trades. The unique features of Chicago Ethanol Derivatives also incentivized ADM to manipulate pricing and trading activity during the MOC on every trading day during a contract month. This last component requires some elaboration.

80.    The settlement format of the Chicago Ethanol (Platts) Futures contract makes it a "diminishing balance contract" under CME Rules 559, 560, and 562, as interpreted by CME Group Advisory RA1711-5 (August 11, 2017). "Diminishing balance contracts are specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration/month end for purposes of position limits…. Diminishing balance contracts are typically those where the final settlement price is equal to the arithmetic average of a determined reference price for each business day that it is determined during the contract month…."

81.    Up to and including the February 2019 contract, the Chicago Ethanol (Platts) Futures contract had a spot-month position limit of 1,000 (equivalent to 42,000,000 gallons of ethanol). However, this spot-month position limit (in net futures equivalents) was only effective at the close of trading three business days prior to the last day of trading of the contract. Until the close of trading three business days prior to the last day of trading of the contract, there was no

spot-month position limit—so long as a party was below the 1,000 contract limit by that time, the party could take much larger positions in the contract earlier in the month.

82.    For non-diminishing-balance contracts, this would mean that a party taking huge positions early in the spot month would have to unwind/close those positions before the close of trading three business days prior to the last day of that month's contract trading. Taking such a large position carries the risk that potential counterparties will learn of the need to get below a position limit and use that information as leverage to secure a better price for them/worse price for the party holding the large position.

83.    In a diminishing balance contract, however, the manipulator can avoid this problem (and perpetuate its manipulation of the market), as a trader's number of futures positions vis-à-vis the position limit decays by an amount equal to the party's total futures position divided by the number of trading days in that month. This reflects the amount of contracts the party holds that were "locked in" by each day's price, as each trading day's price settlement has that proportional impact on the final settlement value at the end of month.

84.    The combination of the limits applying only to the last three days prior to the last trading day in the spot month and the diminishing-balance leads to abuse. Because the average open interest in the front-month of the Chicago ethanol contract is generally between 7,500-15,000 contracts, the diminishing-balance-basis calculation means that a market participant could hold (i) up to 90% of the open interest (6,600/7,500) during all of the spot month and not violate the exchange's position limits, and (ii) 100% of the open interest in other months (and up until the last three days of trading in the spot month). This limit is therefore not effective. Indeed, 6,600 contracts on a per-gallon basis is more than five times the size of the storage capacity at the Argo Terminal (6,600,000 barrels vs. 1,200,000 barrels).

85.     Accountability levels are not linked to open interest and do not materially impact a large market participant's trading activity. The accountability level for the Chicago ethanol contract—7,000 on an aggregate basis—is not tied to open interest. For example, if the open interest in the second-month contract were 5,000 contracts, a market participant could hold the entire open interest, and the exchange would not have to look into the position or the possibility that it could be used for manipulation because it would fall below the 7,000-contract limit. Even if the position exceeded the limit, there is no guarantee that the exchange would take any action to address the situation.

86.     Moreover, NYMEX recognizes several exceptions to the spot-month position limit, including a bona-fide hedging exception, enabling a creative market participant with the goal of manipulating prices through large futures positions to seek an exception that eliminates the limits altogether. As elaborated below, the financial short position ADM has taken far outpaces its monthly production and therefore cannot be considered a hedge.

87.     ADM could exploit the diminishing balance nature of the Chicago Ethanol (Platts) Futures contract, allowing ADM to take short positions in the spot month as large as 6,000-7,000 contracts, representing 50% or more of the open interest in the spot month (and 2-3 times ADM's total monthly ethanol production capacity). ADM could then let those large positions decay down below applicable position limits as the month progressed.

88.     Starting with the March 2019 contract, the CME changed the spot-month limit at the close of trading three business days prior to the last day of trading to 500 (equivalent to 21,000,000 gallons of ethanol). CME has not, however, imposed any position limit for earlier in a trading month, leaving ADM free to use the diminishing balance nature of the Chicago Ethanol (Platts) Future contract to amass outsized short positions (albeit less outsized than before the

changes) in the spot month and let those positions decay downward below applicable position limits.

89.     The final take-away from all of these features is that ADM could sell a comparatively small amount of ethanol at aggressive prices during the MOC window in order to drive the Chicago Benchmark Price down, while at the same time holding and benefitting from disproportionately larger short positions in Chicago Ethanol Derivatives. The lower prices ADM received for physical ethanol during the MOC window were offset by gains on short derivatives positions, particularly when repeated across all of the MOC windows within a month. And, if market fundamentals outside of ADM's control drove ethanol prices in the spot month upward, ADM could still limit its losses on derivatives shorts via downward manipulation, while at the same time offsetting derivatives losses through higher margins on sales of physical ethanol.

90.     Here is a more concrete illustration of the math behind ADM's incentive to manipulate. The maximum number of ethanol deals ever sold during the daily half-hour MOC window was 40 deals of 5,000 barrels of ethanol (on December 4, 2017), or the equivalent of just 200 Chicago Ethanol (Platts) Futures contracts (which each represent 1,000 barrels). During the Relevant Period, ADM frequently had short positions in the spot month approaching or exceeding 7,000 Chicago Ethanol (Platts) Futures contracts, the equivalent of 350 contracts per MOC window day (7,000 contracts / 20 trading days in typical month = 350). So long as ADM's sales in the MOC window each trading day in the month did not exceed nearly twice the maximum amount of sales that had ever occurred during the MOC window (and far fewer than 40 deals were sold during most MOC windows), ADM would profit from manipulation.

F.      **The Mechanics of ADM's Manipulation.**

91.     ADM saw the vulnerabilities described above and decided to capitalize on them. In its simplest form, ADM's scheme consisted of two steps that it repeated each month, starting

November 10, 2017. Since November 2017, ADM has repeatedly engaged in a practice of aggressively hitting the lower-priced bids of ethanol buyers at the Argo Terminal during the MOC window. ADM has also consistently shown aggressively priced offers so as to be the lowest seller offer during the MOC window or to force a competitor to make an even more aggressive offer in order to offload their ethanol inventory at the Argo Terminal. ADM intended both practices to artificially depress the Chicago Benchmark Price calculated during the MOC window and they have in fact resulted in artificially depressed Chicago Benchmark Prices on all or virtually all trading days during the Relevant Period.

92.     First, ADM placed huge bets in Chicago Ethanol Derivatives in each spot month that the price of ethanol would decrease on an absolute basis (a "short position") and on a spread basis (a "short spread"). Second, during the spot month, ADM drove down the price of ethanol during the MOC window to ensure that its short bets paid off.

93.     ADM accomplished the downward manipulation of the Chicago Benchmark Price via practices that were contrary to ADM's non-manipulation economic interest and to MOC pricing customs. ADM used the vulnerabilities at the Argo Terminal as a weapon in effectuating the manipulation.

94.     The Argo Terminal handles a number of products, including ethanol. It has storage tanks and reports total storage capacity for all products of approximately 2.5 million barrels.[1] The total capacity for ethanol storage is smaller (between 1 million and 1.2 million barrels), depending on the space at the nearby, semi-fungible Kinder Morgan Stony Island terminal.[2] Among the

---

[1]  *Argo, IL Terminal*, Kinder Morgan, Inc., https://www.kindermorgan.com/content/docs/terminalbrochures/mw_argo.pdf.

[2]  See Josh Pedrick, *Argo terminal redirects ethanol trucks amid high Midwest stocks: sources*, S&P Global Platts, available at https://www.spglobal.com/platts/en/market-insights/latestnews/

services provided at the Argo Terminal are loading and unloading barges from the Chicago Sanitary and Ship Canal. It is common knowledge within the ethanol industry that the Argo Terminal faces frequent challenges to manage large commodities shipments delivered by barge. On average, the Argo Terminal can load approximately two barges per day (inbound and outbound combined). Thus, large deliveries by barge hinder the Argo Terminal's ability to move outbound supply and process inbound supply in a timely manner.

95.     Based on the Argo Terminal's capacity constraints, a single participant in the Chicago ethanol market can effectively control more ethanol than there is storage for at the Argo Terminal with a position of just 1,200 contracts (1,200 contracts * 1,000 barrels/contract = 1.2 million barrels). This number of contracts is just larger than the spot-month-position limit in the Chicago ethanol contract. However, as discussed further herein, market participants can hold more than six times this limit—more than six times the Argo Terminal's total storage capacity— throughout the entire spot month (and far more in other months and for all but three days of the spot month) and still comply with the exchange's spot-month-position limit.

96.     Beginning around November 2017, heavy inbound rail was moving through the Argo Terminal and persisted through 2018, despite market conditions.

97.     ADM has intentionally disrupted the proper functioning of the Argo Terminal by sending a meaningful number of well-timed barges into the Terminal at or near the same time. Ethanol-market participants are aware of the limited take-away capabilities of the Argo Terminal. Nonetheless, market participants have expressed their opinion that, on at least one occasion in November 2018, ADM nominated multiple barges to the Argo Terminal from the Gulf Coast

---

agriculture/112017-argo-terminal-redirects-ethanol-trucks-amid-high-midwest-stocks-sources (noting that the "Argo and Stony Island terminals comprise Kinder Morgan's fungible system").

knowing that doing so would cripple the Terminal's inbound and outbound supply capabilities and force it to store ethanol in tanks, creating the appearance of excess supply and further downward pressure on prices, which is precisely what occurred. In addition, ethanol in Gulf Coast locations was trading at 10-cent premiums to Argo around this time. A reasonable producer would have sold or even moved ethanol to the Gulf Coast to capture the premiums, but ADM did the opposite.

98.     Between November 2017 and October 2019, ADM has accounted for more than 68% of the total volume of physical ethanol sales at the Argo Terminal in the MOC pricing window. In the months of June 2018, December 2018, and June 2019, ADM accounted for more than 85% of sales in the MOC pricing window while only buying on one occasion. In November 2018, ADM accounted for 94% of sales and 48.5 million gallons volume. During the Relevant Period, ADM accounted for 100% of the sales volume during the closing window on 163 out of the 487 trading days. In essence, since November 2017, ADM has been the sole seller at the Argo Terminal 33% of the time. Even on days when ADM did not represent 100% of the selling volume, its percentage of the total selling volume was still significant. ADM comprised at least 50% of the selling volume during the closing window for almost three-quarters of the trading days during this period. And its total selling volume in 2018 was seven times larger than the next largest seller at the Argo Terminal.

99.     Hitting bids at the opening of the MOC window (or aggressively hitting the bid in general) has no rational economic basis other than manipulating downward the price of ethanol at the Argo Terminal.

100.     As a seller of ethanol, ADM had a primary interest in selling ethanol at the highest price possible without losing sales to competitors and taking steps to move product where it was most in need to achieve the best value. By targeting the Platts window and hitting bids immediately

or aggressively, ADM gave buyers little opportunity to adjust their bids on ethanol during the MOC window upward. ADM also undercut offers of competing sellers in the MOC window by more than was necessary to secure a given sale of ethanol within the MOC window. As a result, ADM lost money—specifically, the money it would have received for physical ethanol sales executed at higher prices that would have resulted from normal price negotiation in the MOC window or selecting sales outside the MOC window.

101.    ADM's practice of aggressively "hitting the bid" and undercutting the current best offer by more than was necessary during the MOC window can be seen in the daily activity reported by Platts. Platts collects data on bids, offers, and trades at the Argo Terminal that occur during the MOC window each trading day. An example of the data collected and reported by Platts from the Argo Terminal is seen from the August 3, 2018 Biofuelscan report reproduced below.

US ethanol bids/offers/trades: (PBF page 209)

- MOC bids: Ethanol: Chicago Argo: Shell bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Eco bids $1.4450/gal, Aug 8-Aug 18, 5Kb; Gunvor bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Valero bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Shell bids $1.4425/gal, Aug 8- Aug 18, 5Kb; BP bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Louis Dreyfus bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Shell bids $1.55/gal, any-August, 25Kb; Hartree bids $1.54/gal, any-August, 25Kb.
- MOC offers: Ethanol: Chicago Argo: Vitol offers $1.4455/gal, Aug 8- Aug 18, 5Kb; ADM offers $1.4475/gal, Aug 8-Aug 18, 5Kb; Center offers $1.45/gal, Aug 8- Aug 18, 5Kb; CHS offers $1.45/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Hartree offers $1.5650/gal, any-August, 25Kb; BP offers $1.5650/gal, any-August, 25Kb.
- MOC trades reported: Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Gunvor, $1.4450/gal, Aug 8- Aug 18, 5Kb. Other trades reported: None.

102.    This excerpted report shows ADM "hitting the bid" as the seller in all 5 trades that occurred during that day's MOC window at $1.4450 per gallon—dropping below its own outstanding offer of $1.4475 per gallon and the best outstanding offer by Vitol at $1.4455 per

gallon. Rather than incentivizing Shell and Gunvor to "lift the offer" and come up to Vitol's (or even ADM's) higher offer prices, ADM decided to leapfrog Vitol in order to "hit the bids" of the two potential buyers at $1.4450, even though they were likely willing to pay more. This can be analogized to a negotiation where two parties make opening demands/offers in anticipation of meeting somewhere in the middle, but one party then simply decides to accept the other party's lowball opening offer that both parties should understand to be simply a starting position rather than a reflection of true willingness to pay. By engaging in a more typical MOC window negotiation process rather than "hitting the bid" on all five trades, ADM (acting in an economically rational way, without manipulation factored in) might have raised the price on some or even all of the 5 deals it sold to a level greater than $1.4450 (perhaps as high as $1.4455 or higher).

103.    This data also shows the impact that ADM's "hitting of the bid" had on the Platts Chicago Benchmark Price for this day. On August 3, 2018, that price was $1.44525 per gallon, a value reflective of the 5 trades at $1.4450 per gallon and the 2.5 points above the outstanding bid ($1.4450 per gallon by multiple buyers) and 2.5 points below the outstanding offer ($1.4455 per gallon by Vitol) during the MOC. This price would have been higher had buyers in the MOC window been forced to "lift the offer" to the $1.4455 per gallon price quoted by Vitol, rather than by ADM hitting the lower $1.4450 per gallon bid on the 5 consummated trades.

104.    In addition to "hitting the bid," ADM has routinely been the lowest offer during the window by a wide margin. For example, on January 12, 2018, ADM had an offer of $1.3075 per gallon. The next best offer was Lansing at $1.33. The wide gap in comparable offers shows that ADM had no interest in selling at the best market price, but rather was intent on selling well below the market.

105.    ADM engaged in this uneconomic trading behavior throughout the Relevant Period. Other examples include:

a.  On December 26, 2017, ADM made a pre-window offer of $1.29 per gallon after Louis Dreyfus offered $1.31 (the next best offer). ADM hit three bids at $1.285, $1.28, and $1.275 and then proceeded to lower its offer to $1.275. ADM consummated 7 trades in total at an average price of $1.274 average price while all other offers expired.

b.  On December 27, 2017, ADM made a pre-window offer of $1.2825 per gallon; the next best offers were Redwood and Koch at $1.295. ADM lowered offer to $1.28, which was then lifted. ADM then posted at $1.2825, which was lifted, and reposted at $1.2825, which was lifted again. ADM consummated three trades at an average price of $1.282, and all other offers expired.

c.  On January 3, 2018, ADM made a pre-window offer of $1.295 per gallon; Redwood, Lansing, and Mercuria had the next best offers at $1.31. ADM hit three $1.29 bids and worked down its offer to $1.29, which was then lifted. ADM consummated four deals at an average price of $1.29, and all other offers expired.

d.  On January 4, 2018, ADM made a pre-window offer of $1.28 per gallon; the next best offer was Lansing at $1.295. ADM hit four bids at $1.27, then three bids at $1.2675, and then lowered its offer to $1.2675, which was lifted. ADM consummated eight deals at an average price of $1.26875, and all other offers expired.

e.  On January 9, 2018, ADM made a pre-window offer of $1.265 per gallon; the next best offer is Mercuria at $1.28. ADM hit four bids at $1.26 and then proceeded to

lower its offer to $1.26, which was lifted, reposted at $1.26, and lifted again. ADM consummated six deals at an average price of $1.26, and all other offers expired.

f.  On January 12, 2018, ADM made a pre-window offer of $1.3075 per gallon; the next best offer was Lansing at $1.33. ADM consummated 8 trades (including two bid hits) at an average price of $1.3074, while all other offers expired.

g.  On August 24, 2018, ADM made a pre-window offer of $1.3125 per gallon; the next best offers were Trafigura and Mercuria at $1.33. ADM hit Shell's bid of $1.31 and then proceeded to have its $1.3125 offer lifted twice. All other offers expired.

h.  On November 27, 2018, ADM made a pre-window offer of $1.20 per gallon; the next best offer was Gunvor at $1.22. ADM hit a bid of $1.195 and then proceeded to lower its offer to $1.195, which was lifted, reposted, and lifted two more times. ADM then reposted and lowers offer to $1.1935, which was lifted. ADM ended the window session by hitting two bids at $1.193, and all other offers expired. ADM consummated seven trades at an average price of $1.1942.

i.  On June 7, 2019: ADM made pre-window offers of $1.4825 and $1.485 per gallon. The only other offer was Eco-Energy at $1.50, which was subsequently withdrawn, leaving ADM with the only offers in the window. ADM lowered its offers to $1.48 and $1.481 – both were lifted. ADM consummated two trades at an average price of $1.4805.

j.  On June 28, 2019, ADM made a pre-window offer of $1.55 per gallon after Kempstar posted a $1.555 offer. ADM hit three bids at $1.5225, $1.5225, and $1.52 and then proceeded to lower its offer to $1.52. ADM then hit a bid of $1.518 to end

the window session. ADM consummated twelve trades at an average price of $1.519, while all other offers were withdrawn.

k.  On July 25, 2019, ADM made a pre-window offer of $1.4825 per gallon; the next best offer was Gunvor at $1.4925. ADM lowered its offer to $1.475, which was lifted. ADM reposted and lowered its offer to $1.474, which was lifted twice, then reposted and lowered its offers to $1.473, $1.4725 and $1.4725, which were all lifted. ADM also hit a $1.472 bid. ADM consummated six trades at an average price of $1.473, and all other offers expired.

l.  On September 6, 2019, ADM posted a pre-window offer of $1.315 per gallon; the next best offer was Kempstar at $1.325. ADM worked its offer down to $1.308, but it was not lifted. Instead, ADM hit seven bids at $1.3075. All offers expired.

m.  On September 20, 2019, ADM posted a pre-window offer of $1.3875 per gallon; the next best offers were Harvestone and Gunvor at $1.40. ADM lowered its offer to $1.385, which was lifted for the only deal of the day. All other offers expired.

n.  On October 1, 2019, ADM made a pre-window offer of $1.70 per gallon after Gunvor posted an offer of $1.75 and Shell an offer of $1.72. All offers expired with no trades consummated.

o.  On October 9, 2019, ADM made a pre-window offer of $1.655 per gallon after Gunvor posted an offer of $1.68 offer. ADM proceeded to lower its offer to $1.648 and hit a bid of $1.645 to end the window session.

106.    ADM's ethanol-selling practices are inconsistent with legitimate economic motives for the additional reason that if an ethanol producer truly needed to offload excess ethanol supply, it could do so through sales spread out over the course of the trading day, so as to reduce its

potential impact on prices. Instead, ADM has focused its sales at the Argo Terminal during the 30-minute closing window each day. ADM has represented 100% of the total sales volume during that period on a regular basis for nearly a third of the trading days between November 2017 and October 2019. The result of this effort has been to counteract any bullish pressure during the closing window that might otherwise produce a higher average of high and low quotes—the basis for the floating price assigned each day to the Chicago ethanol contract.

107.    Given this concentrated activity, it is not surprising that potential market participants have expressed concern about even entering the Chicago ethanol market. In a properly functioning market, ADM's influence would have eventually been offset by natural forces—for example, pricing arbitrage or increased logistical costs (such as demurrage) to the counterparty. ADM further appeared to have resisted efforts by others to purchase its product at a premium in other markets and to have avoided selling its product through other channels, instead focusing largely on the Argo terminal.

108.    This manipulation is distorting price-discovery mechanisms, exposing current market participants to artificial supply and demand forces, and discouraging prospective market participants from entering the ethanol market. Moreover, the manipulation extends beyond the Chicago market: ethanol prices in the Chicago market serve as a reference price for more than 70% of physical-ethanol-pricing locations in the United States.

109.    For example, ADM has used the futures market to demonstrate its ability to deliver additional volumes into Chicago, including product from nearby ethanol plants. In September 2018, ADM registered all 579 ethanol contracts for delivery on CBOT (in the physically settled Denatured Fuel Ethanol Futures contract), which was the most in the history of the contract at that time. Commodity producers typically hedge against price decreases by establishing short futures

positions. But there rarely is an economic justification for a producer to register all of those contracts for delivery. Such conduct signals to the market that there is excess supply and, thus, that prices are too high.

110.    ADM's trading in the Chicago ethanol contract has also appeared to be uneconomic. As a producer, ADM has an incentive to hedge its supply in a manner consistent with its production schedule. For example, if ADM knows that it will produce 42,000 gallons of ethanol each month (the equivalent of one Chicago ethanol contract) and that it needs six months of coverage, ADM should sell one contract in each corresponding future month. However, ADM has consistently sold most of its Chicago ethanol contracts at high liquidity points on the market curve in 2018—weighted more toward the first several months—in order to exert more influence on near-term prices. The need for such an outsized financial position is atypical of any rational ethanol producer, which would only be looking to hedge the appropriate production. This strategy is uneconomic by offsetting ADM's production with a financial speculative position that far outsized its hedging needs as a producer. In essence, to the extent that ADM's hedging program makes any sense financially, it is because it relies on continued, unnatural, and downward influence on futures and cash prices—the ongoing manipulation.

111.    ADM's manipulation benefitted its short positions in the Chicago ethanol futures market by allowing it to profitably roll the positions forward into later months and, on occasion, offset the positions altogether at a profit.

112.    This strategy of rolling forward short futures positions and offsetting some at a profit can only work if the market is in a state of contango: if the "forward price of a futures

contract is higher than the spot price."[3] Ethanol derivatives have historically traded in normal backwardation, or when the "spot price of a futures contract is higher than the forward price." ADM's constant downward pressure on futures prices—for example, during 2018—has produced this very result. The only purpose for ADM applying this pressure through its window sales was to manipulate the pricing mechanism, thereby hurting other traders and physical sellers relying on that pricing mechanism. This point is supported by ADM only selling ethanol in the MOC window and then routinely buying ethanol outside of the window. The only purpose for the window sales was to manipulate the window/pricing mechanism to benefit ADM's financial position, thereby impacting other producers' physical ethanol sales priced off this pricing mechanism.

113.    For example, ADM artificially depressed prices in the front-month Chicago ethanol contract between June 1, 2018, and October 1, 2018, and this conduct also influenced prices downward in later contract months: the November 2018 Chicago ethanol contract dropped from $1.4975 per gallon to $1.3175; the December 2018 contract dropped from $1.4900 to $1.3350; the Jan. 2019 contract dropped from $1.4775 to $1.3550; and the Feb. 2019 contract dropped from $1.4825 to $1.3700.

114.    As a result of these price changes in the Chicago ethanol contract, ADM has been able to synthetically roll its short futures positions forward at a profit. In particular, ADM could allow the prompt-month positions to cash-settle at artificially low prices and then sell later-month futures at higher prices (to reestablish a hedge position). It could also offset its short futures

---

[3]    *What is Contango and Backwardation?*, CME Group, Inc., at https://institute.cmegroup.com/courses/introduction-to-ferrous-metals/modules/what-is-contango-and-backwardation. A market in "backwardation" is the opposite—the price of forward month futures contracts is lower than the current spot price. *Id.*

positions altogether at a profit because prices had declined so dramatically since the positions were first established.

115.    As long as prices continue moving in this same pattern, ADM could continue rolling its futures positions forward at a profit and continue benefitting from ongoing manipulation. And if and when ADM decides to begin purchasing ethanol again (as it has done historically), it will benefit through the ability to purchase significant amounts of physical ethanol at artificially reduced prices, once again exposing market participants to severe changes in supply and demand and discouraging others from entering the market altogether.

## G.    Evidence Indicating That ADM Engaged in Manipulation

116.    Ample evidence indicates that ADM has in fact manipulated both the Chicago Benchmark Price and the values of Chicago Ethanol Derivatives during the Relevant Period.

117.    In 2016 and 2017, the falling price of ethanol in the U.S. was squeezing or eliminating the profit margins of ethanol producers, causing them to idle plants or consider exiting the business altogether. Indeed, ADM attempted to sell three of its dry mill ethanol facilities (in Columbus, Nebraska; Cedar Rapids, Iowa; and Peoria, Illinois) beginning in 2016, but it did not obtain adequate bids to justify their sale. Nevertheless, until November 2017, ADM had consistently been one of the largest buyers of ethanol at the Argo Terminal, including during the price-setting MOC window.

118.    Starting shortly before November 2017 and continuing thereafter, ADM began to amass huge short positions in Chicago Ethanol Derivatives. These huge positions represented a significant departure from ADM's previous hedging activities. In various months during the Relevant Period, ADM acquired as many as 6,000-7,000 Chicago Ethanol (Platts) Futures contracts within the spot month—positions that were over twice as large as ADM's monthly

production capacity, and represented 50% or more of the open interest in the relevant contract month.

119.     Also starting in November 2017 and continuing thereafter, ADM suddenly shifted from being a frequent buyer of ethanol at Argo, including during the MOC window, to being one of the largest sellers—even as ethanol prices continued to decline. By 2018, ADM accounted for roughly 70% of all ethanol sold at the terminal, and roughly 90% of sales during the price-setting MOC window. In the month of November 2018, ADM sold 95% of the ethanol volume that traded during the price-setting MOC window.

120.     The shift toward ADM becoming the largest seller of ethanol at the Argo Terminal during the MOC window occurred even as ADM's competitors (including Green Plains) cut production runs, shut down or idled plants, or sold ethanol plants due to slumping ethanol prices and margins.

121.     In October 2017, when ADM was the buyer in 32% of the Argo Terminal transactions during the MOC window, the settlement price of the Chicago Ethanol (Platts) Futures contract (which averages the Chicago Benchmark Prices across the entire month) was $1.425 per gallon.

122.     But in 15 of the following 21 months—when ADM was the dominant seller during the MOC window—the Chicago Ethanol (Platts) Futures contract settled at prices below the $1.425 per gallon level of October 2017:

| Month | Monthly Volume | Settlement Price |
|-------|---------------|------------------|
| Oct-17 | 131,831 | 1.425 |
| Nov-17 | 109,511 | 1.4045 |
| Dec-17 | 95,604 | 1.2965 |
| Jan-18 | 123,178 | 1.3045 |
| Feb-18 | 96,516 | 1.4423 |
| Mar-18 | 111,301 | 1.4589 |
| Apr-18 | 105,967 | 1.4635 |
| May-18 | 105,619 | 1.46 |
| Jun-18 | 82,702 | 1.4123 |
| Jul-18 | 66,953 | 1.4233 |
| Aug-18 | 111,631 | 1.3561 |
| Sep-18 | 85,728 | 1.2782 |
| Oct-18 | 77,796 | 1.2806 |
| Nov-18 | 87,007 | 1.2357 |
| Dec-18 | 79,017 | 1.2129 |
| Jan-19 | 101,333 | 1.2644 |
| Feb-19 | 92,092 | 1.3321 |
| Mar-19 | 131,299 | 1.3589 |
| Apr-19 | 110,149 | 1.3205 |
| May-19 | 121,567 | 1.3706 |
| June-19 | 96,843 | 1.5448 |
| July-19 | 96,231 | 1.4953 |

123.   ADM took the economically irrational approach of buying at the Argo Terminal when prices and margins were higher (pre-November 2017), and shifting toward becoming a massive seller (and remained one) right as prices and margins declined, including in December 2018 when the Chicago Benchmark Price hit 15-year lows. This is strong evidence both of ADM having actually engaged in manipulation and of its manipulation having achieved the desired price-depressing effect.

124.   ADM's aggressive selling of ethanol during the MOC window is also economically irrational in the context of its own ethanol purchases at the Argo Terminal during the Relevant Period. In an effort to drive down the Chicago Benchmark Price, ADM frequently sold more ethanol during the MOC window than it could physically deliver. As a result, ADM had to buy

ethanol at the Argo Terminal to meet its contracted obligations. ADM routinely did so toward the end of the trading month, at prices that were higher than the prices it had sold ethanol for earlier in the month.

125.    Notably, in the Relevant Period, ADM only bought ethanol in the window one time, on May 24, 2019. ADM has only had 15 active bids (compared to 2,147 active offers) in the window during this period. But the MOC window is likely where ADM would have found the most competitive price, thanks to the public and ostensibly competitive bidding process that was supposed to take place in those 30 minutes. Instead, ADM made all of its physical ethanol purchases outside of the MOC window, thereby avoiding having its own purchases increase the Chicago Benchmark Price and harm ADM's ethanol derivatives positions.

126.    As further evidence of ADM's manipulation, pricing data from the Relevant Period demonstrates that ADM could have received significantly higher prices and profits for its ethanol at other terminals or directly from other potential buyers, even after factoring in differences in transportation costs.

127.    An analysis of Bloomberg pricing data also supports the inference that ADM began its manipulation scheme on or around November 2017. In the 17 months between June 1, 2016 and October 31, 2017, the average differential in price between the Argo Terminal and the other three terminals was roughly 4.9 to 15.5 cents per gallon. This means that, on average, from June 1, 2016 to October 31, 2017, an ethanol producer could have received between 4.9 and 15.5 cents more by selling their ethanol at New York Harbor/Gulf Coast/West Coast than at Argo (with 4.9 cents representing the additional price at the terminal closest in price to Argo, and 15.5 cents representing the additional price at the terminal highest in price compared to Argo).

128.     The existence of some persistent price differential between Argo and these other terminals is to be expected. It is easier and cheaper to transport ethanol to the Argo Terminal (via barge, railcar, or truck) than to these other major terminals because ethanol is predominantly produced in the Midwest. The persistent differential between the Argo Terminal and the other terminals thus roughly reflected the increased transport costs (and the risk to price changes during transit) involved in shipping ethanol to these other terminals.

129.     But beginning in November 2017 and continuing through at least March 30, 2019, the pre-existing differential suddenly and persistently increased to between 10.4 and 22.1 cents per gallon. There was no corresponding sudden and persistent increase in transport costs that could explain the increase of this inter-terminal price differential. Accordingly, it is reasonable to infer that, since November 2017, the Argo Terminal price has been artificially depressed by at least 5 cents per gallon, and during some periods significantly more. An econometric analysis will establish that it was ADM's manipulation that caused this sudden and persistent increase in the inter-terminal price differential, as opposed to other factors. The table below provides some data-points on the differential pre- and post-November 2017.

|  | **Pre-Manipulation**<br>June 1, 2016-October 31, 2017 | **Manipulation Period**<br>November 1, 2017-March 31, 2019 |
|---|---|---|
| Difference in Price Per Gallon for Ethanol Between Argo Terminal and the Terminal with the Next-Price | 4.94 cents per gallon (average) 5 cents per gallon<br><br>10 cents per gallon (maximum—July 21, 2017) | 15.48 cents per gallon (average)<br><br>15.5 cents per gallon (median)<br><br>22 cents per gallon (maximum—October 9, 2017) |
| Difference in Price Per Gallon for Ethanol Between Argo Terminal and the Terminal with the Highest Price | 10.44 cents per gallon (average) 10 cents per gallon<br><br>18.5 cents per gallon (maximum—March 27, 2019) | 22.09 cents per gallon (average) 21 cents per gallon<br><br>43.75 cents per gallon (maximum—August 21, 2018) |

130.    To put it another way, assuming that the 4.9 to 15.5 cents per gallon differential from June 1, 2016 to October 31, 2017 represents the average additional transport costs to ship to these other terminals, and those costs did not increase, then ADM could have sold its ethanol for at least 5 cents per gallon more at these other terminals than it received at the Argo Terminal (even after factoring in transport costs) during the Relevant Period after November 1, 2017.

131.    Indeed, while the "average" differential between the Argo price and the terminal with the next-lowest price between June 1, 2016 and October 31, 2017 had been 4.9 cents per gallon, the same differential never fell below that amount after November 1, 2017. The average monthly differential between the Argo Terminal price and the prices at the other major terminals thus persistently increased after November 2017 on an ongoing basis as a result of ADM's manipulation scheme.



132.   Had ADM been acting in an economically rational manner and not engaging in intentional manipulation, it would have sought the highest available price (factoring in the costs of transport) for its physical ethanol sales. During the Relevant Period, the highest available price was not at the Argo Terminal during the MOC window, but rather at other terminals such as New York Harbor, Gulf Coast, West Coast, and Rule 11 as the data above demonstrates, or from other non-terminal buyers in the market.

133.   The reactions of other sophisticated participants in the ethanol derivatives market to the anomalous pricing coming out of the Argo Terminal post-November 2017 also provides strong evidence of ADM's manipulation scheme. Various news stories and industry chatter indicated that some ethanol market participants suspected that ADM was accumulating large short

positions in Chicago Ethanol Derivatives while engaging in unprecedented and irrational selling activity during the MOC window.

134. For instance, on September 12, 2018, Reuters journalist Jarrett Renshaw reported and tweeted that ADM "ramps up ethanol sales in Chicago, irking rivals," noting that ADM had "accounted for roughly 61 percent of the 9.5 million ethanol barrels sold at [the Argo Terminal] between November [2017] and August [2018]," and that "heavy selling by ADM has led traders who have lost money on the slumping ethanol market to complain to S&P Global Platts."[4]

135. Renshaw also reported on the same day that "[o]n the Chicago Board of Trade, ADM registered all 579 ethanol contracts [the CME's Ethanol Futures Contract, EH] for delivery as of Tuesday, each contract representing 29,000 gallons—or enough for about one rail tanker car— the most in the history of the contract, according to CME Group data."[5]

136. ADM's anomalous pricing and trading behavior at the Argo Terminal after November 2017 led various market participants to complain to Platts about the potential manipulation of the Chicago Benchmark Price. In response to those complaints, Platts paid for and hosted a July 2018 meeting at its offices located at 111 Bagby Street in Houston, Texas, and invited major ethanol producers, brokers, and other stakeholders. Among the approximately 40 participants in the July 2018 meeting were Adam Kuffel of ADM; Sophie Byron and Ian Dudden of Platts; and representatives from Green Plains, as well as POET, Shell, Trafigura, Vitol, CCI,

---

[4]    https://twitter.com/JarrettRenshaw/status/1039971701763829761;    https://twitter.com/
JarrettRenshaw/status/1039971344077795328;   https://www.reuters.com/article/us-usa-ethanol-
adm/commodities-giant-adm-ramps-up-ethanol- sales-in-chicago-rivals-idUSKCN1LS303

[5]    https://twitter.com/JarrettRenshaw/status/1039973948451168256;    https://www.reuters.com/
article/us-usa-ethanol-adm/commodities-giant-adm-ramps-up-ethanol-sales-in-chicago-irking-
rivals-idUSKCN1LS303

Biourja, Eco-Energy, Mercuria, and Marquis Energy. The CME also sent a senior official—Vish Subramanian, CME Group's Director of Energy Products—to attend the July 2018 meeting.

137.    At the meeting, Platts solicited comments from attendees on its methodology for calculating the Chicago Benchmark Price during the MOC window, whether any changes should be implemented in the methodology, and if so, why. In response, some participants pointed to ADM's aggressive selling and hitting the bid during the MOC window as evidence that the benchmark price could be unduly influenced by an aggressive seller.

138.    ADM's representative Adam Kuffel did not directly address the implication that ADM might be having an outsized impact on the Chicago Benchmark Price. Kuffel instead voiced ADM's opposition to an effort by some participants to decrease the ITT deliverable time for ethanol for the MOC window from the current 5 to 15 days forward to just 2 to 10 days forward. Notably, a reduction in the ITT deliverable time would constrain ADM's ability to manipulate the MOC window through aggressive selling of ethanol beyond what ADM could physically deliver. Specifically, ADM would have fewer days to find and buy ethanol outside the MOC window to satisfy all of its delivery obligations.

139.    At the end of the meeting, Platts promised to consider recommendations from all participants, but said it would not be able to change anything before the beginning of 2019. Platts did not adequately address the volume of physical ethanol traded by each participant in the market. More specifically, although Platts noted that there were several sellers of physical ethanol at the Argo Terminal, Platts did not adequately address the fact that ADM accounted for the vast majority of sales, especially during the 30-minute closing window. And Platts did not sufficiently study the Argo Terminal's inbound and outbound capabilities and how those capabilities could be affected by large deliveries through barge.

140.    Realizing that the Platts methodology was not being changed, Platts' competitor Argus Media saw an opportunity to lobby ethanol stakeholders and the CME to create an alternative to the susceptible-to-manipulation Platts window, based on either an average price throughout the whole day of transactions at the Argo Terminal, or using the so-called "Rule 11" calculation of prices at a railway switch near Chicago where buyers take railcars from sellers and return them after emptying.

141.    Argus invited the CME and other ethanol market participants to a meeting in November 2018 at a hotel in Houston to discuss whether there was demand for a new ethanol derivative product that could generate sufficient liquidity and could not be manipulated by ADM. Argus specifically did not invite ADM to this meeting.

142.    Participants at this meeting included representatives from Green Plains, as well as POET, Trafigura, Eco-Energy, CCI, Mercuria, and Biourja. The CME again sent Vish Subramanian to attend on its behalf. Despite not being invited, Adam Kuffel of ADM nonetheless attended the November 2018 meeting.

143.    At this meeting, Kuffel expressed his opinion that the market was functioning effectively and that ADM saw no reason to change the status quo. Jordan Fife of Biourja asked Kuffel why, if ADM thought the ethanol market was healthy, it brought in railcars to the Argo Terminal against "arbs" (*i.e.,* at lower prices than they could have received via arbitrage at other terminals or from other buyers) in April/May 2018.

144.    Kuffel responded that he was "not at liberty to discuss ADM's strategies in this venue"—which did not explain ADM's otherwise irrational sale practices at the Argo Terminal.

**H.      The Impact of ADM's Manipulation on Physical Sales of Ethanol.**

145.    ADM knew that its unlawful, manipulative actions to lower the Chicago Benchmark Price, which were undertaken to secure improper market advantages, harmed other participants in the physical ethanol market.

146.    ADM's manipulation caused all physical sales of ethanol by Green Plains and other ethanol producers that were tied to the Chicago Benchmark Price to occur at a lower price than they would have in the absence of such manipulation.

147.    Market participants rely on the Chicago Benchmark Price to be "fair" and undistorted by manipulation. ADM manipulated this benchmark and thereby lowered the prices at which Green Plains and other ethanol producers sold ethanol under contracts that were negotiated with a justifiable expectation that the Chicago Benchmark Price would not be manipulated.

148.    ADM manipulated the Chicago Benchmark Price to distort the market signals that suppliers, customers, and all other participants and stakeholders rely upon to make rational decisions about ethanol values. Prices incentivize behavior, and ADM engaged in uneconomic behavior that resulted in uneconomic outcomes to the detriment of Green Plains and the other members of the proposed Class when it manipulated the Chicago Benchmark Price. Because of the link to vital agriculture and energy sectors of the economy, regulators and policymakers also monitor and react to ethanol prices. Wrong ethanol prices—wrong because ADM manipulated them downward—can lead to wrong policies.

149.    The harmful effect of ADM's conduct on Green Plains and the other members of the proposed Class was both foreseeable and probable. The CME recognizes that many entities use the CME's products for pricing benchmarks and fair value and, therefore, manipulated markets

damage a broad spectrum of users—not just those holding the instrument itself.[6] Further, it is well known in the industry that prices from the MOC window activity at the Argo terminal are used as the benchmark for physical ethanol contracts across the country, pricing over 70% of all physical ethanol, and are also used in international contracts.[7]

150.    ADM therefore knew that its manipulation of the ethanol market would drive down the Chicago Benchmark Price and the price that Green Plains and the other members of the proposed Class received for ethanol under sales contracts, thereby denying Green Plains and the other members of the proposed Class a level playing field and causing financial adversity.

## I.    ADM's Senior Executives Knew about the Manipulation Scheme.

151.    The manipulation scheme was not the product of two rogue employees in ADM's ethanol division. They implemented their scheme with the knowledge of senior ADM officials, who were aware that the ethanol division was earning outsized profits from large short positions in Chicago Ethanol Derivatives as a result of ADM's aggressive selling activity during the MOC window at the Argo Terminal.

152.    ADM's ethanol division routinely generated reports on its operations and its profits/losses for senior ADM officials, who in turn aggregated the reports into company financial reports for disclosure to ADM's investors. These reports kept senior ADM officials updated on

---

[6]  *See* CME Group, *Corn and Soybean Delivery Terms*, at 2, available at https://www.cmegroup.com/education/files/corn-soybean-delivery-terms.pdf ("An effective delivery system for the Chicago Board of Trade's Corn and Soybean futures contracts is a critical issue for market users throughout the United States and the world. The contracts are universally recognized for providing an accurate price benchmark and effective risk management tools for a broad spectrum of users.").

[7] *See* Jarrett Renshaw, *Kinder Morgan to Expand Chicago Ethanol Hub to Calm Glut Concerns*, available at https://ca.reuters.com/article/idUSKCN1Q91G6.

the ethanol division's performance and aware that the division was generating outsized trading profits despite historically low ethanol margins.

153.    Indeed, senior ADM officials publicly acknowledged the success of the manipulation scheme, though they couched it in euphemism. In an ADM earnings call on November 6, 2018 reporting on the third quarter of 2018—a time of extremely low ethanol margins during which ADM was aggressively manipulating the Chicago Benchmark Price downward— ADM Executive Vice President and Chief Financial Officer Ray Guy Young reported (discussing the slide below) that ADM's bioproducts team (which included the ethanol group) "did a good job managing risk in [an] extremely weak ethanol industry margin environment." ADM's 10-Q from the third quarter of 2018 reported bioproducts had earned a $43 million operating profit, even as ADM's ethanol producer competitors were suffering losses because of this "extremely weak ethanol industry margin environment."



154.    ADM's 2018 10-K filing likewise implicitly acknowledged the success of the manipulation scheme. For instance, ADM stated that for 2018 compared to 2017, "[b]ioproducts results were down as near record industry fuel ethanol inventories pressured margins and

production issues in the Decatur, IL corn complex increased costs, partially offset by effective ethanol risk management."[8] In the same filing, discussing 2017 performance compared to 2016, ADM noted that "[b]ioproducts profit increased due to higher trading results partially offset by slightly lower ethanol margins."[9]

155.     On information and belief, the "effective ethanol risk management" and "higher trading results" in 2017 and 2018 referenced in ADM's 2018 10-K refer to the manipulative scheme discussed in this complaint, and reflect the fact that senior ADM officials, such as those involved in preparing ADM's annual report, were made aware by Ray Bradbury and Adam Kuffel of the manipulative scheme and its impact on the bioproducts division's profit.

## CLASS ACTION ALLEGATIONS

156.     Plaintiffs seek to represent and certify the following Class under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who sold ethanol after November 1, 2017 at prices that were determined in reliance upon the Chicago Ethanol (Platts) Futures (CME symbol: CU), Chicago Ethanol (Platts) Average Price Options (CME symbol: CVR), the CME's Ethanol Futures Contracts (CME symbol: EH), any OPIS price assessments, any Platts price assessments, the Chicago Benchmark price, and any other pricing benchmarks determined by or impacted by Platts Chicago Terminal ethanol assessments, and were damaged as a result of the decrease in the Chicago Ethanol (Terminal) price caused by ADM's trading activity at the Argo Terminal.

157.     Excluded from the Class are: ADM; the officers, directors, or employees of ADM; any entity in which ADM has a controlling interest; any affiliate, legal representative, heir, or assign of ADM and any person acting on their behalf. Also excluded from the Class are any judicial

---

[8] ADM 2018 Form 10-K (filed Feb. 19, 2019) at 33.

[9] *Id.* at 40.

officers presiding over this action and the members of their immediate families and judicial staff, as well as any juror assigned to this action.[10]

158.    The Class is readily ascertainable based on records and transaction data in the possession of CME, ADM, Plaintiffs, and the other members of the proposed Class.

159.    There are potentially hundreds if not thousands of geographically dispersed members of the proposed Class, making joinder impracticable.

160.    Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and the other members of the proposed Class sustained damages arising out of ADM's manipulation in violation of the CEA. The damages and injuries of each member of the proposed Class were directly caused by ADM's wrongful conduct. ADM's defenses with respect to Plaintiffs' claims, if any, are typical of defenses to the claims of all members of the proposed Class.

161.    There are questions of law and fact common to the Class, including, but not limited to, the following:

- whether ADM manipulated Chicago Benchmark Prices or the prices of Chicago Ethanol Derivatives;

- whether ADM's conduct constitutes manipulation under the CEA;

- whether ADM's conduct constitutes tortious interference with contracts for the physical sale of ethanol;

- whether ADM's conduct was willful and intentional;

- the appropriate class-wide measure of damages, including whether members of the proposed Class are entitled to additional punitive or exemplary damages equal to two times the amount of their actual damages under the CEA; and

---

[10] Plaintiffs reserve the right to narrow or otherwise amend the above Class definition before they file their motion for class certification, including based on discovery obtained from ADM or non-parties.

- the appropriate injunctive and other equitable relief for the proposed Class.

162.    These common questions of law and fact predominate over any questions affecting only individual members of the proposed Class.

163.    Plaintiffs will fairly and adequately protect the interests of the other members of the proposed Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the proposed Class, and they have retained counsel competent and experienced in the prosecution of class actions and financial litigation to represent them and the other members of the proposed Class.

164.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the proposed Class would impose heavy burdens on the courts, ADM, and relevant non-parties, and would create a risk of inconsistent or varying adjudications. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of members of the proposed Class to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

### COUNT ONE—Manipulation in Violation of the Commodity Exchange Act

165.    Plaintiffs repeat and reallege paragraphs 1-149 as if fully set forth herein.

166.    Plaintiffs bring this Count individually and on behalf of the other members of the proposed Class.

167.    ADM specifically intended to and did manipulate the prices of the following commodities and futures in violation of the CEA, 7 U.S.C. § 1 *et seq.*: (1) ethanol sold at the Argo Terminal; (2) the Chicago Ethanol (Terminal) price calculated based on trading activity during the

MOC window at the Argo Terminal; (3) the Chicago Ethanol (Platts) Future (CU) traded on NYMEX; (4) the Chicago Ethanol (Platts) Average Price Options Contract (CVR) traded on NYMEX; and (5) the Ethanol Futures Contracts (EH) traded on CBOT.

168.   ADM possessed the ability to influence the Chicago Ethanol (Terminal) price (and thus the settlement/price of the aforementioned Chicago Ethanol Derivatives contracts linked to that price). ADM successfully created artificial Chicago Ethanol (Terminal) prices by selling ethanol during the price-setting MOC window at prices that were below what ADM could have received at other available terminals or in privately negotiated sales, below what ADM could have realized by negotiating during the MOC window, and at times below ADM's own variable costs of production. ADM did so in order to benefit positions ADM had taken in the aforementioned Chicago Ethanol Derivatives that were priced/settled based on the Chicago Ethanol (Terminal) price.

169.   ADM's manipulative conduct and trading activity alleged herein constituted manipulation of the Chicago Ethanol (Terminal) price used to settle/price the aforementioned Chicago Ethanol Derivatives between November 2017 and the present, in violation of the CEA, 7 U.S.C. §§ 6b(a), 6c(a), 9(1), 9(3), 13(a)(2), and 25(a), as well as 17 C.F.R. § 180.2.

170.   As a direct result of ADM's unlawful conduct, Plaintiffs and the other members of the Class suffered actual damages and injury in fact due to losses they incurred when selling physical ethanol at prices that were determined in reliance upon the aforementioned Argo Terminal between November 2017 and the present, to which Plaintiffs and the other Class members would not have been subject but for ADM's unlawful conduct alleged herein.

171.    Because ADM's conduct was willful and intentional, Plaintiffs and the other members of the proposed Class are entitled to additional punitive or exemplary damages equal to no more than two times their actual damages for the violations of the CEA alleged herein.

### COUNT TWO—Tortious Interference with Contractual Relations

172.    Plaintiffs repeat and reallege paragraphs 1-149 as if fully set forth herein.

173.    Plaintiffs bring this Count individually and on behalf of the other members of the Class.

174.    Plaintiffs and the Class had valid contractual relationships that were tied to OPIS, Platts, CU, the Chicago Benchmark, and other pricing benchmarks determined by or impacted by Platts Chicago Terminal ethanol assessments (collectively, the "Pricing Benchmarks") that were affected by ADM's unlawful manipulation.

175.    ADM was aware of these valid contractual relationships of Plaintiffs and the Class that were tied to the Pricing Benchmarks.

176.    ADM, through its unlawful manipulation, intentionally interfered with these valid contractual relationships of Plaintiffs and the Class that were tied to the Pricing Benchmarks.

177.    ADM knew that its unlawful, manipulative actions to lower the Pricing Benchmarks, which were undertaken to secure improper market advantages, came at the expense of other market participants. ADM intended to lower prices in the spot market (OPIS and Platts) to lower prices in the futures market (CU), and ADM expected to recover losses from its OPIS and Platts sales through its positions in the derivatives market. ADM knew that it would take losses in the spot physical markets that it would more than recover in the derivatives market.

178.    ADM caused the contractual relations of Plaintiffs and the Class that were tied to the Pricing Benchmarks to be less profitable, which made their performance more expensive.

179.   Market participants rely on the Pricing Benchmarks to be "fair," not manipulated. ADM manipulated these indices and thereby lowered the prices at which Plaintiffs and the Class sold ethanol under contracts that market participants negotiated with a justifiable expectation that the indices would not be manipulated. ADM manipulated the Pricing Benchmarks to distort the market signals that suppliers, customers, and all other participants and stakeholders rely upon to make rational decisions about ethanol.

180.   The harmful effect of ADM's conduct on Plaintiffs and the Class was both foreseeable and probable. The CME recognizes that many entities use CME's products for pricing benchmarks and fair value and, therefore, manipulated markets damage a broad spectrum of users—not just those holding the instrument itself.[11] Further, it is well known in the industry that prices at the Argo terminal are used as the benchmark for deals across the country and are also used in international contracts.[12]

181.   ADM therefore knew that its manipulation of the ethanol market would drive down the Pricing Benchmarks that determined what Plaintiffs and the Class received for ethanol under sales contracts, thereby denying Plaintiffs and the Class an economic advantage by causing its performance to be more expensive or burdensome.

182.   ADM's conduct was unjustified.

---

[11]   *See* CME Group, Corn and Soybean Delivery Terms, at 2, available at https://www.cmegroup.com/education/files/corn-soybean-delivery-terms.pdf ("An effective delivery system for the Chicago Board of Trade's Corn and Soybean futures contracts is a critical issue for market users throughout the United States and the world. The contracts are universally recognized for providing an accurate price benchmark and effective risk management tools for a broad spectrum of users.").

[12] *See* Jarrett Renshaw, Kinder Morgan to Expand Chicago Ethanol Hub to Calm Glut Concerns, available at https://ca.reuters.com/article/idUSKCN1Q91G6.

183.   As a direct and proximate result of ADM's intentional interference, Plaintiffs and the Class have suffered damages, including, without limitation, one or more of the following: lost profits, a diminishment in future earning capacity, emotional distress, reputational harm, impairment of business relationships, and consequential losses.

184.   ADM should be subject to punitive damages because its actions were unlawful, oppressive, and malicious.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in their favor and against ADM as follows:

a.   Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.   Ordering ADM to pay actual, statutory, punitive and exemplary damages, and restitution to Plaintiffs and the other members of the proposed Class, as allowable by law;

c.   Ordering ADM to pay both pre- and post-judgment interest on any amounts awarded;

d.   Enjoining ADM from continuing the misconduct alleged in this Complaint and issuing any other appropriate injunctive and other equitable relief against ADM;

e.   Ordering ADM to pay attorneys' fees and costs of suit; and

f.   Ordering such other and further relief as may be just and proper.

## JURY DEMAND

185.   Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 14, 2020            /s David A. Domina
                                  David A. Domina #11043NE
                                  **DOMINA LAW GROUP PC LLO**
                                  2425 South 144th Street
                                  Omaha, Nebraska  68144
                                  Tel.: (402) 493-4100
                                  ddomina@dominalaw.com

                                  Adam J. Levitt
                                  John E. Tangren
                                  Mark S. Hamill
                                  **DiCELLO LEVITT GUTZLER LLC**
                                  Ten North Dearborn Street, Sixth Floor
                                  Chicago, Illinois  60602
                                  Tel.: (312) 214-7900
                                  alevitt@dicellolevitt.com
                                  jtangren@dicellolevitt.com
                                  mhamill@dicellolevitt.com

                                  Greg G. Gutzler
                                  **DiCELLO LEVITT GUTZLER LLC**
                                  444 Madison Avenue, Fourth Floor
                                  New York, New York  11022
                                  Tel.: (646) 933-1000
                                  ggutzler@dicellolevitt.com

                                  ***Counsel for Plaintiff and the Proposed Class***