IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GREEN PLAINS TRADE GROUP LLC,<br>GREEN PLAINS INC.,<br>GREEN PLAINS WOOD RIVER LLC,<br>GREEN PLAINS ORD LLC,<br>GREEN PLAINS ATKINSON LLC,<br>GREEN PLAINS CENTRAL CITY LLC,<br>GREEN PLAINS YORK LLC,<br>GREEN PLAINS SHENANDOAH LLC,<br>GREEN PLAINS OTTER TAIL LLC,<br>GREEN PLAINS FAIRMONT LLC,<br>GREEN PLAINS HEREFORD LLC,<br>GREEN PLAINS MOUNT VERNON LLC,<br>GREEN PLAINS MADISON LLC,<br>GREEN PLAINS HOPEWELL LLC,<br>GREEN PLAINS SUPERIOR LLC,<br>GREEN PLAINS OBION LLC,<br>GREEN PLAINS BLUFFTON LLC,<br>individually and on behalf of all others similarly situated,<br><br>          Plaintiffs<br><br>          v.<br><br>ARCHER DANIELS MIDLAND COMPANY,<br><br>          Defendant. | Case No. 8:20-cv-00279-LSC-MDN<br><br>Hon. Laurie Smith Camp<br><br>Magistrate Judge Hon. Michael D. Nelson<br><br>ORAL ARGUMENT REQUESTED |

**ADM's MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

## INTRODUCTION

Plaintiffs allege that beginning in November 2017, ADM artificially manipulated the price of ethanol by selling it too cheaply at a particular terminal in Argo, Illinois whose prices are used as a factor in setting benchmark prices used in certain other ethanol contracts. Their complaint largely copies a complaint filed by a different plaintiff in Illinois federal court over a year ago. It even repeats defective claims that the federal court in Illinois has already dismissed. The few differences there are between the two complaints expose additional defects that require dismissal of this entire case.

The first difference is that although both complaints assert a claim for price manipulation under the Commodity Exchange Act, the Act's private right of action does not authorize the claims made in the present case. Plaintiffs allege they were injured by selling *physical* ethanol at depressed prices, but the Act does not allow a private litigant to sue for losses from selling a commodity. The only permissible claim is for losses from trading in *financial derivatives* (such as futures or options) that are based on a commodity. That is the claim in the Illinois case. But Plaintiffs' alleged losses came from selling physical commodities, so the Act bars their claims.

The second difference is that Plaintiffs here delayed too long before suing. The Illinois case was filed in early September 2019, but Plaintiffs waited over 10 months—until mid-July 2020—to copy it. The Act's two-year statute of limitations in both cases was triggered in November 2017, when all plaintiffs admit they became aware of the alleged losses. The Illinois case was timely, but the present case is not, so Plaintiffs' cause of action under the Act must be dismissed.

The third difference is that Plaintiffs' complaint adds to the Illinois complaint a meritless claim for tortious interference with contractual relations. That state law claim conflicts with—

and is therefore preempted by—the Act, because it would allow a claim that the Act bars (a private litigant's claim for losses from selling physical commodities at allegedly manipulated prices), at a time the Act does not allow for any civil lawsuits (more than two years after a loss). The Act empowers government agencies such as the Commodity Futures Trading Commission to make claims such as the ones Plaintiffs attempt to make, and Plaintiff may not use a state law claim to usurp that power. The tortious interference claim must be dismissed.

In addition, Plaintiffs failed to plead a plausible claim of tortious interference. That claim requires factual allegations showing that the defendant knowingly interfered with a specific contract, leading to its breach. But the complaint alleges no specific contracts to which Plaintiffs were party, no knowing interference by ADM with a specific contract, and no breach of any contract. (In fact, the complaint alleges that whatever contracts Plaintiffs have in mind were actually performed, not breached.) That trifecta of failed allegations comes as no surprise, given that Plaintiffs' complaint copies the Illinois complaint, where no tortious interference claim was asserted. The addition of the interference claim is simply an ineffective effort to distinguish this case from the Illinois case.

ADM has also filed a motion to transfer venue to the court in Illinois. If this Court denies the transfer of venue, it should dismiss the entire complaint with prejudice.

## BACKGROUND

### A. Ethanol, ADM, and Plaintiffs

Ethanol is a renewable fuel made primarily from corn. (Compl. ¶ 33) In 2016 and 2017, because of an excess of supply in the market, the price of ethanol was falling, which "was squeezing or eliminating the profit margins of ethanol producers." (¶ 117)

2

ADM is "one of the country's largest producers of ethanol" and has its headquarters in Illinois. (¶¶ 28, 43) Plaintiffs are Green Plains Inc., an Iowa corporation, and its subsidiaries, which are Delaware, Iowa, Tennessee, and Indiana limited liability companies. (¶¶ 10–27) Plaintiffs are among "the largest sellers of ethanol," with production plants in numerous states, including Illinois, and annual production and sales of over one billion gallons. (¶¶ 10, 11, 23)

### B.   Ethanol prices

Federal law requires gasoline producers to blend renewable fuels such as ethanol into gasoline. (¶¶ 34–35) For that reason, the main buyers of ethanol are refineries, blenders, gasoline resellers, and the like. (¶¶ 34–35) They can buy ethanol directly from a producer, or they can buy it at one of the 1,200 ethanol storage "terminals" located around the country. (¶¶ 36, 45)

The ethanol terminal in Argo, Illinois is located near Chicago's Midway Airport. It is one of the nation's largest and most important ethanol terminals. (¶ 45) (Pictures of it can be found at kindermorgan.com/content/docs/terminalbrochures/mw_Argo.pdf.) ADM has five ethanol production facilities, capable of producing over 1.2 billion gallons of ethanol each year, that are located within a short shipping distance (250 miles) of the Argo Terminal. (¶ 74) Plaintiffs concede, as they must, that these factors give ADM a greater natural ability than its competitors to get more ethanol to the Argo Terminal at lower cost, and to sell it there at "lower prices." (¶¶ 73–74)

From 1:00 to 1:30 pm on each trading day at the Argo Terminal is a period known as the "Market-on-Close." (¶ 47) Before 1 pm, buyers post the prices at which they are bidding to buy ethanol, and sellers post the prices at which they are offering to sell it. (¶ 48) Buyers and sellers may negotiate, and when bid and offer prices match, there is a sale. (¶ 49) Plaintiffs accuse ADM

of artificially manipulating the price of ethanol downward by accepting low-priced bids to buy and making low-priced offers to sell. (¶ 4)

Sales that take place during the Market-on-Close are one factor used to calculate a so-called "benchmark" price for ethanol. (¶ 47) Some physical ethanol sales are priced based on pricing at the Argo Terminal. (¶ 8) The prices of some ethanol futures and options, which are financial derivatives bought and sold on exchanges such as the Chicago Board of Trade, are also based in part on that benchmark price. (¶ 55)

### C. The *AOT* complaint

On September 4, 2019, a financial firm named AOT, which trades in ethanol futures, sued ADM in the Central District of Illinois. (Ex. A[1] (AOT Complaint)) The complaint asserted that ADM violated the Commodities Exchange Act by manipulating downward the ethanol benchmark price set during the Market-on-Close at the Argo Terminal. That was the only count in the complaint.

ADM moved to dismiss the *AOT* complaint. The court granted the motion in part and denied it in part. As explained below, the court dismissed claims brought under 7 U.S.C. §§ 6b(a) and 6c(a), which Plaintiffs also assert in the present case. (Ex. B (Order Granting in Part and Denying in Part ADM's Motion to Dismiss))

### D. Plaintiffs' complaint and causes of action

Plaintiffs filed their complaint on July 14, 2020. It is largely copied from the *AOT* complaint, including dozens of pages of the same allegations with little or no change in wording, as well as the same claims under the Act. But where AOT's alleged losses were from trading in

---

[1] Pursuant to Nebraska Civil Rule 7.1(a)(2), Exhibits A and B to ADM's Memorandum in Support of its Motion to Dismiss are filed separately with ADM's Index of Evidence in Support of its Motion to Dismiss.

ethanol futures, Plaintiffs' alleged losses (and the losses of putative class members) are solely from selling physical ethanol. (¶¶ 8, 156, 170)

Plaintiffs' complaint cites six sections of the Act and one section of regulations—7 U.S.C. §§ 6b(a), 6c(a), 9(1), 9(3), 13(a)(2), 25(a), and 17 C.F.R. § 180.2—without specifying the purpose and contents of each provision or how they connect to any of the factual allegations. (¶ 169) Generally speaking, the relevant portions of sections 9(1), 9(3), 13(a)(2), and 180.2 prohibit manipulating commodity prices; section 6b(a) prohibits fraud in commodities contracts; and section 6c(a) prohibits commodity transactions that are fictitious sales or are used to cause something other than a "true and bona fide price" to be reported. Finally, section 25(a) provides a private right of action, but, as discussed below, only to certain persons for certain claims.

Plaintiffs' complaint also adds to the *AOT* complaint a second count, for tortious interference with contracts. Plaintiffs allege that ADM's price manipulation interfered with Plaintiffs' contractual relationships by causing the performance of those contracts to be less profitable. (¶¶ 176, 178) Notably, Plaintiffs do not allege any specific contracts or that any contracts were breached.

## ARGUMENT

I. **All of Plaintiffs' claims under the Act should be dismissed.**

    A. **The Act only provides a private right of action to buyers or sellers of financial derivatives, but Plaintiffs' claims are based on selling ethanol.**

Plaintiffs' sole assertion of a right to recover under the Act is that ADM manipulated the price of ethanol, and as a result "Plaintiffs and the other members of the Class suffered actual damages and injury in fact due to losses they incurred when selling physical ethanol" at lower prices. (¶ 170; *see also* ¶¶ 8, 145–150, 156, 167-68) But the Act does not authorize a private suit to recover for losses from selling a physical commodity.

5

The Act's private right of action is codified at 7 U.S.C. § 25(a). The only provision potentially relevant here states that a person who violates the Act by manipulating the price of an underlying commodity, as Plaintiffs allege ADM did, is only liable to a person *who is injured from buying or selling a futures contract, option, or swap based on that commodity*. *Id.* § 25(a)(1)(D)(ii). Congress limited the private right of action to persons who trade in financial derivatives, but the complaint never alleges that Plaintiffs (or putative class members) did so. There is *no* private right of action for persons, such as Plaintiffs, who claim to be injured from buying or selling the commodity itself.

The Act emphasizes that the "rights of action" it authorizes "shall be the exclusive remedies under [the Act] available to any person who sustains loss as a result of any alleged violation of [the Act]." 7 U.S.C. § 25(a)(2). Thus, even if a person claims to have suffered a loss due to a violation of the Act, as Plaintiffs purport to, there can be no private lawsuit unless the Act authorizes it—and here the Act does not. *Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1152–53, 1154 (7th Cir. 1992) (interpreting the parallel provision at § 25(b) as "foreclose[ing] all other remedies, including any on behalf of non-traders" of financial derivatives, because it "limits the availability of private rights of action … under the CEA to those who have engaged in futures trading").

In the *AOT* case, the plaintiff alleged that it "traded in [ethanol] derivatives and suffered damages due to ADM's manipulation." (Ex. A ¶ 6.) The Act authorizes that type of claim. But when Plaintiffs in the present case copied the *AOT* complaint, they failed to notice that they were repeating a claim that AOT is able to make, but based on the allegations in their complaint, Plaintiffs themselves are not.

Courts do not hesitate to dismiss claims under the Act, like Plaintiffs', that are based on buying or selling a physical commodity. For example, the defendant in *Thompson's Gas & Elec. Serv. v. BP Am.*, 691 F. Supp. 2d 860, 862 (N.D. Ill. 2010), admitted it manipulated the price of propane. The plaintiffs, who were propane buyers, sued under the Act. But the court held that only persons trading in financial derivatives could state a claim. The plaintiffs' "own damages allegations show that all of their alleged losses occurred as a result of purchasing physical propane," so their claim was dismissed. *Id*. at 871; *see also BDI Capital v. Bulbul Investments*, 446 F. Supp. 3d 1127, 1135 (N.D. Ga. 2020) (dismissing a claim under the Act that was based on trading in the commodity); *Berk v. Coinbase*, 2018 WL 5292244, at *2 (N.D. Cal.) (same); *In re Dairy Farmers of Am., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 965–66 (N.D. Ill. 2014) ("Purchasers of physical commodities … do not have a claim.")

Plaintiffs here admit that their claims (and those of the putative class members) are based solely on selling physical ethanol. For that reason, they cannot state a claim under the Act, so Count One should be dismissed with prejudice.

### B. The statute of limitations bars Plaintiffs' claims.

The Act states that all suits "shall be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). Plaintiffs filed this case on July 14, 2020, so if their cause of action arose before July 14, 2018, it is untimely and must be dismissed.

For the Act and other statutes that do not define when a cause of action arises, federal courts apply the "'discovery accrual rule.'" *Levy v. BASF Metals*, 917 F.3d 106, 108 (2d Cir.) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). The rule provides that a cause of action accrues when a plaintiff discovers "a loss that was the result of a CEA violation." *Id.* "'A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—

7

the focus is on the discovery of the harm itself.'" *Id*. (quoting *Cancer Found. v. Cerberus Capital Mgmt.*, 559 F.3d 671, 674 (7th Cir. 2009)).

Plaintiffs allege ADM was manipulating prices in November 2017 (*e.g.*, ¶¶ 2, 91, 129, 169), and Plaintiffs incurred losses immediately: "ADM's manipulation caused *all* physical sales of ethanol by Green Plains … to occur at a lower price" (¶ 146 (emphasis added)). Plaintiffs allege they "suffered actual damages and injury in fact due to losses they incurred when selling physical ethanol at prices that were determined in reliance upon the aforementioned Argo Terminal"—as of "November 2017." (¶ 170)

Given that they claim to have suffered losses in November 2017, Plaintiffs had until November 2019 to sue. AOT sued in September of that year, still within the limitations period. But Plaintiffs waited more than 10 months, until July 2020, to copy the *AOT* complaint and begin this case. By then, they were more than eight months beyond the statutory deadline. Their claims under the Act must be dismissed.

Plaintiffs will no doubt respond that they did not know the details of ADM's alleged price manipulation in November 2017, so the limitations period should start later. But the discovery accrual rule will not allow that argument. All that matters is when Plaintiffs discovered the loss: "The relevant inquiry … is not whether [plaintiff] had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint. Rather, the question is when [plaintiff] discovered her CEA injury—that is, a loss that was the result of a CEA violation." *Levy*, 917 F.3d at 108. "'[T]he focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim.'" *Id*. at 109 (quoting *Cancer Found.*, 559 F.3d at 674). Once Plaintiffs were aware of their injury—sales at lower prices—"the CEA gave [them] two years to ascertain the facts necessary to bring [their] suit." *Id*. By their

8

own allegations, Plaintiffs suffered losses from price manipulation in November 2017, so the limitations period began at that time.

Given the above principles, it is obvious that Plaintiffs cannot rely on the filing of the *AOT* complaint to make their claims timely. In *Levy*, the plaintiff alleged that she bought platinum futures in 2008 and lost her entire investment when the platinum market crashed in August of that year. 917 F.3d at 107. Then, in the fall of 2014, she learned of a class action lawsuit that "first apprised her" of the defendants' conduct in manipulating the price of platinum, as well as the defendants' identities. *Id*. at 108. Like Plaintiffs in the present case, she filed her own copycat lawsuit. *Id*. She argued that information she learned in the class action case made her claims timely. *Id*.

The Second Circuit disagreed. It held that the plaintiff's "CEA claims accrued when she discovered her CEA injury," which was "when she suffered her losses in 2008." *Id*. Her "knowledge of her CEA injury 'start[ed] the clock,' irrespective of when she discovered the additional information necessary for her to bring suit." *Id*. at 109 (quoting *Rotella*, 528 U.S. at 555). She could not claim that her discovery of an injury came after 2008, because her complaint alleged that in 2008 prices had moved "without any fundamental reason" and with "no explanation … other than market distortion due to manipulation." *Id*. at 109.

Plaintiffs' allegations in the present case, similarly, assert that contemporaneous and publicly available information clearly showed price manipulation as of November 2017. They allege that as of November 2017, ADM's supposedly manipulative sales of ethanol were taking place on the open market. (¶ 91) ADM allegedly accepted bids for ethanol at low prices and offered to sell ethanol at low prices—all in view anyone watching transactions for half an hour each day at the Argo Terminal. (*Id*.) Plaintiffs also allege there was a publicly observable shift in

9

ADM's trades: before November 2017, ADM was a frequent buyer, but during November 2017 and thereafter, ADM sold over two-thirds of the physical ethanol at the Argo Terminal in the half-hour window. (¶¶ 98, 119) Plaintiffs allege that shift matched the movement of prices; for most months after November 2017, the price was lower than the pre-November price. (¶¶ 121–22.)

Plaintiffs also allege that publicly available pricing data show ADM was manipulating prices in November 2017. (¶ 127) The data supposedly show that the difference in ethanol prices between the Argo Terminal and other terminals at that time was so high it could not be explained by any "corresponding sudden and persistent increase in transport costs" between terminals, thus showing the price at Argo was artificially low. (¶¶129, 131) Plaintiffs even allege that ADM's public "anomalous pricing and trading behavior at the Argo Terminal after November 2017 led various market participants to complain" about price manipulation. (¶ 136)

Having alleged losses in November 2017, and having pleaded that contemporaneous and publicly available information shows those losses resulted from a violation of the Act, Plaintiffs were plainly aware in November 2017 about their supposed injury. That triggered the limitations period, which expired two years later, eight months before they sued. All of Plaintiffs' claims under the Act should be dismissed.

Plaintiffs may also respond that they did not violate the statute of limitations because they allege price manipulation conduct by ADM that occurred within two years of the filing of this case—that is, conduct after July 2018. The complaint alleges that ADM executed a "scheme" consisting of the same "two steps that it repeated each month, starting November 10, 2017,"

which resulted in "artificially depressed … [p]rices on all or virtually all trading days during the Relevant Period" of November 2017 to the present.[2] (¶ 91)

That argument, which could extend the limitations period indefinitely, cannot succeed, as the Seventh Circuit has held. The plaintiff in *Dyer v. Merrill Lynch*, 928 F.2d 238, 239 (7th Cir. 1991), was an investor in silver futures. His relationship with his broker began in February 1984, and by September he had suffered losses. *Id.* at 240. The losses peaked in May 1985, and the plaintiff closed his account. *Id*. He sued the broker in April 1987, claiming 41 violations of the Act over the course of the relationship, and the broker invoked the Act's two-year statute of limitations.

The plaintiff argued his suit was timely because the limitations period did not begin until May 1985, when he incurred his final losses and closed the account, but the Seventh Circuit rejected that argument. His complaint showed that the plaintiff "understood the amount of his losses and the reason for them in the fall of 1984," so "the statute of limitations commenced running at that time." *Id*. at 240-41. Given that he sued more than two years later, the Seventh Circuit held that ***all*** of his claims under the Act—including "claims occurring ***within*** two years of the filing of the suit are time-barred." *Id*. at 241 (emphasis added).

The result should be the same here. Plaintiffs knew about their losses, ADM's public trades at the Argo Terminal, and the public pricing data in November 2017. That is when the limitations period began. If that were not enough, by their own allegation, their losses and ADM's conduct continued ***every month*** thereafter—December, January, February, March, April,

---

[2] Although it uses the capitalized term "Relevant Period" a dozen times, the complaint does not define it. That is because "Relevant Period" was a term defined in a Glossary of Terms alleged in the *AOT* complaint, but Plaintiffs neglected to copy the glossary into their complaint. The *AOT* complaint stated that the "Relevant Period runs from November 2017 to the present." Plaintiffs' complaint makes allegations about ADM's conduct through October 2019. (Ex. A ¶ 105(o))

11

May, and June. (¶¶ 91, 105(a)-(f), 122) Any or all of these would also have triggered the statute. Thus, in any event, the limitations period began running before July 2018, so this suit filed in July 2020 is untimely even to the extent it relies on more recent events. Congress gave Plaintiffs two years to sue, but they delayed eight months too long. All of their claims under the Act are time-barred and should be dismissed with prejudice.

### C. Plaintiffs' claims under sections 6b(a) and 6c(a) fail as a matter of law.

Plaintiffs' cause of action under the Act should also be dismissed to the extent it is based on asserted violations of 7 U.S.C. §§ 6b(a) and 6c(a), for the same reasons the court in the *AOT* case dismissed those claims.

#### 1. Plaintiffs do not allege a violation of section 6b(a).

The complaint (¶ 169) relies on 7 U.S.C. § 6b(a), which as relevant here generally prohibits fraud in commodity futures contracts. Rule 9(b) requires § 6b(a) claims—including the element of making a misrepresentation, *CFTC v. Int'l. Fin. Servs.*, 323 F. Supp. 2d 482, 499 (S.D.N.Y. 2004) (citing *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002))— to be pleaded with particularity. *DGM Invs. v. New York Futures Exch.*, 265 F. Supp. 2d 254, 263 (S.D.N.Y. 2003); *CFTC v. Am. Metals Exch.*, 693 F. Supp. 168, 190 (D.N.J. 1988). But Plaintiffs do not allege ADM made *any* misrepresentation in connection with a futures contract. As explained above, Plaintiffs do not even allege they bought or sold futures.

The court in the *AOT* case faced this same claim. (Paragraph 169 of Plaintiffs' complaint is identical to paragraph 131 of the *AOT* complaint.) The court held that there were no "allegations consistent with a fraud claim under § 6b(a)" and therefore dismissed it. (Ex. B at 6.) The same is true here, so any claim based on § 6b(a) should be dismissed.

12

### 2. There is no private right of action under section 6c(a).

The complaint (¶ 169) also relies on 7 U.S.C. § 6c(a), but that section "cannot sustain a private cause of action." *Ploss v. Kraft Foods Group*, 197 F. Supp. 3d 1037, 1067 (N.D. Ill. 2016); *see also Taylor v. Bear Stearns,* 572 F. Supp. 667, 676-79 (N.D. Ga. 1983). Under 7 U.S.C. §§ 25(a)(1) and (2), plaintiffs may only sue for violations of specific sections of the Act, and section 6c is not among them.

Again, the court in *AOT* faced this same claim. The court dismissed it with prejudice, finding that "any claim premised on § 6c(a) of the CEA must be dismissed because that section does not provide for a private cause of action." (Ex. B at 7.) The result should be the same here.

## II. For two reasons, the tortious interference claim should be dismissed.

### A. The Act preempts the tortious interference claim.

The Act declares a public interest at the "national" level in "managing and assuming price risks, discovering prices, [and] disseminating pricing information" about commodities and financial derivatives based on those commodities. 7 U.S.C. § 5(a). To that end, the Act was enacted in part to address "price manipulation." *Id*. § 5(b).

Congress took a deliberate path toward accomplishing that purpose. The Act bars "manipulat[ing] the price of any commodity in interstate commerce." *Id*. § 13(a)(2); *see also id.* § 9(1); 17 C.F.R. § 180.2. But, as discussed above, Congress only authorized persons claiming to be injured from trading in financial derivatives to file a civil lawsuit, and Congress imposed a two-year statute of limitations on all civil claims. All *other* violations may be redressed not by a civil lawsuit, but *only* through enforcement by the Commodity Futures Trading Commission, *id*. §§ 13a-1, 13b; prosecution by the Department of Justice, *id*. § 13(a)(2); or a civil lawsuit filed by a state attorney general or other state officer, *id*. § 13a-2(1). By asserting a claim for tortious

13

interference based on nothing more than allegations of "unlawful" or "illegal" commodity price manipulation under the Act (¶¶ 4, 8, 165, 172, 174, 176, 179), Plaintiffs are seeking to cast aside the limitations that Congress put on private rights of action, as well as the remedial scheme that Congress established to address other violations.

State law claims are preempted if they "would frustrate the purpose of Congress in enacting the Commodity Exchange Act." *Effex Capital v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019). That is precisely what would happen here. In the Act's regulation of commodity price manipulation, Congress decided who is and who is not authorized to file a private lawsuit, and Congress decided the permissible time for such lawsuits. Yet Plaintiffs are attempting to use a state law cause of action to pursue a private claim that the Act bars, in a time period the Act does not allow for civil lawsuits, to address an alleged violation of the Act that only the CFTC, DOJ, and state officers may address. Using a claim under state law to transfer enforcement power from the government to a private litigant the Act bars from suing would frustrate the Act's purposes. For that reason, the Act preempts Plaintiffs' state law claim.

The fact that Plaintiffs lack standing to sue under the Act is no objection to applying preemption under the Act to dismiss their state law claims. In *Am. Agric*, for example, the Seventh Circuit dismissed the plaintiff's claims under the Act and then held the Act preempted the plaintiff's state law claims. *Am. Agric.*, 977 F.2d at 1153, 1157; *see also Marentette v. Abbott Labs.*, 886 F.3d 112, 121 (2d Cir. 2018) ("The lack of private right of action in the [federal] statute and the complex enforcement scheme that Congress did enact … suggests that Congress did not want individuals to be able" to sue under state law). The result should be the same here. "Congress has the right to determine the remedies available and the individuals who are eligible

14

for those remedies," *Effex*, 933 F.3d at 896, and Plaintiffs are not within that group. Their tortious interference claim should be dismissed with prejudice.

### B. Plaintiffs failed to plead a plausible tortious interference claim.

Plaintiffs' improper attempt to use a claim of tortious interference to assert a price manipulation claim that the Act forbids is further undermined by their complete failure to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). Plaintiffs appear to have attempted to plead an interference claim to distinguish this case from *AOT*, whose complaint they copied, but that effort fails because the interference claim is a non-starter and not sufficiently pled.

The first element of a tortious interference claim is the existence of a valid contract. *E.g., Vande Guchte v. Kort*, 703 N.W.2d 611, 623 (Neb. Ct. App. 2005). Plaintiffs refer vaguely to "sales contracts" for physical ethanol, and to their own "contractual relations" and "contractual relationships," but nothing more. (¶¶ 8, 174–176, 178) They do not state how many contracts are at issue, who the parties to those contracts were, what the terms were, or anything else to put ADM on notice of what contracts ADM supposedly interfered with.[3] That is the paradigm of a "[t]hreadbare recital[] of the elements of a cause of action" that the Supreme Court has held "do[es] not suffice." *Iqbal*, 556 U.S. at 678.

The second element is ADM's knowledge of the contract(s). *Vande Guchte*, 703 N.W.2d at 623. Continuing their threadbare recital, Plaintiffs allege nothing more than "ADM was aware

---

[3] Given that Plaintiffs provided no information about any contracts, ADM assumes for the sake of argument that Nebraska law governs this claim. In the event this claim survives dismissal, ADM reserves the right to argue based on a full choice of law analysis that the laws of one or more other states apply.

15

of these valid contractual relationships." (¶ 175) But without allegations about actual contracts, there can be no plausible allegation ADM was aware of them. *Seoul Laser Dieboard Sys. v. Serviform*, 957 F. Supp. 2d 1189, 1201 (S.D. Cal. 2013) (plaintiff "allege[d] no facts from which the Court can plausibly infer the existence of a specific and valid contract or Defendants' knowledge of that contract"). As in *Seoul*, here it is not enough to allege some form of general awareness by ADM of the existence of physical ethanol contracts between some unidentified buyers and sellers. To allow otherwise would strip all substance out of this element of the cause of action.

Third, Plaintiffs must plead "'an intentional act which induces or causes a breach or termination of the relationship.'" *Forest Prod. Indus. v. ConAgra Foods*, 460 F.3d 1000, 1002 (8th Cir. 2006) (quoting *Pettit v. Paxton,* 583 N.W.3d 604, 609-10 (Neb.1998)); *see also Hroch v. Farmland Indus*., 548 N.W.3d 367, 370 (Neb. App.1996). But Plaintiffs allege no breach or termination. In fact, Plaintiffs allege the exact opposite. They allege the contracts were *performed* (¶ 178)—albeit at lesser value to Plaintiffs—but that is an admission that dooms their claim. For all these reasons, this Court should dismiss Count Two with prejudice.

## CONCLUSION

ADM respectfully urges this Court to dismiss the entire complaint with prejudice.

Dated: September 14, 2020

Respectfully Submitted,

ARCHER DANIELS MIDLAND COMPANY

*s/ John P. Passarelli*
John P. Passarelli, Bar No. 16108
James M. Sulentic, Bar No. 19610
Maggie L. Ebert, Bar No. 24394
Attorneys for Defendant
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Fax: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com
maggie.ebert@kutakrock.com

Stephen V. D'Amore
Scott P. Glauberman
Samantha M. Lerner
Reid F. Smith
Attorneys for Defendant
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sdamore@winston.com
sglauberman@winston.com
slerner@winston.com
rfsmith@winston.com
T: (312) 558-5600
F: (312) 558-5700

*Counsel for Defendant Archer Daniels Midland Company*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to Nebraska Civil Rule 7.1(d)(3), I hereby certify that the foregoing brief contains 5,226 words, as measured by the word-count function of Microsoft Word 365, applied to include all text, including the caption, headings, footnotes, and quotations, and therefore complies with this Court's word limit for this brief pursuant to Nebraska Civil Rule 7.1(d).

*s/ John P. Passarelli*
John P. Passarelli, Bar No. 16108
James M. Sulentic, Bar No. 19610
Maggie L. Ebert, Bar No. 24394
Attorneys for Defendant
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Fax: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com
maggie.ebert@kutakrock.com

Stephen V. D'Amore
Scott P. Glauberman
Samantha M. Lerner
Reid F. Smith
Attorneys for Defendant
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sdamore@winston.com
sglauberman@winston.com
slerner@winston.com
rfsmith@winston.com
T: (312) 558-5600
F: (312) 558-5700

*Counsel for Defendant Archer Daniels Midland Company*

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2020, I electronically field the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David A. Domina
DOMINA LAW GROUP PC LLO
2425 South 144th Street
Omaha, Nebraska 68144
Tel.: (402) 493-4100
ddomina@dominalaw.com

Greg G. Gutzler
DICELLO LEVITT GUTZLER LLC
444 Madison Avenue, Fourth Floor
New York, New York 11022
Tel.: (646) 933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
John E. Tangren
Mark S. Hamill
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
mhamill@dicellolevitt.com

*s/ John P. Passarelli*
John P. Passarelli, Bar No. 16108